## No. 13,335.

## VINCENT LOSECCO vs. ALBERT GREGORY.

### SYLLABUS.

1. An agreement stipulating a sale of "all oranges my trees may produce in the years 1899 and 1900," *held* not to be an *aleatory* contract.

2. A clause in the contract reciting that "purchaser assumes all risks," *held* to mean all usual, known, ordinary, foreseen risks that may attend the inception, growth, development and maturity of the orange crop; not extraordinary or unforeseen risks, like the utter destruction of the entire grove of trees.

3. This assumption of risk by the purchaser applies to the thing sold, viz., the orange crop; not to that which was to produce the crops—the trees themselves. Its application cannot be extended to the inclusion of the life of the trees.

#### ON APPLICATION FOR REHEARING.

1. By our code the hope of a future crop is made merchantable as an incorporeal thing separate from the crop, so that parties may make either this hope, or the crop itself the subject of their contract of sale.

2. Where the future crop itself is sold the sale becomes null for want of a thing to constitute its subject, if the crop fails entirely, or practically so; and in such case the price must be restored.

3. But where only the hope is sold, the sale is proof against eventualities.

4. The hope is a presently existing thing, and it not being susceptible of delivery, its delivery accompanies the act of sale; the seller of it no more warrants its continued existence, or the continued existence of the conditions which form its basis, than the seller of a horse warrants the continued existence of the horse.

5. Written contracts are to be construed not so much according to mere verbal criticism as according to what, all things considered, was most probably the intention of the parties.

6. Clauses couched in general terms, which if taken literally would lead to inadmissible consequences, must be construed according to what, under all the circumstances of the matter, was most probably the intention of the parties.

7. Chief among the circumstances to be considered in determining whether the

Losecco vs. Gregory.

subject of the sale of a future crop was the crop itself, or the mere hope of it, is the comparison between the price agreed upon and the value of the crop; the inference being one way or the other, according as the disparity between the price and the value is wide or narrow.

8. An admission that a witness present in court would make a certain statement, is not stronger or better evidence than the statement itself would have been if made by the witness.

9. Where the thing sold is described as "two crops of oranges on my place, as follows: all the oranges that my trees may produce in the year 1899; all the oranges that my trees may produce in the year 1900;" and the clause is added, "Purchaser assumes all risks;" and it appears that theretofore cold weather had been known to cut off the crop of the year, but never within the memory of the oldest inhabitant to kill the trees, or so to injure them as to prevent the crop of the following season; and there comes such cold weather as kills the trees; and there is no proof of the value of the crop and no proof of local custom; *held*, that the sale was not of a mere hope, but of the crops themselves, and that the purchaser assumed the risk of the loss of the crop of the year, but not of the loss of the crop of the following season.

## ON REHEARING.

1. In a suit involving a principal and a reconventional demand, if three justices concur in rejecting the principal demand, and three concur in rejecting the reconventional demand, there is a concurrence of a majority of the court.

2. Technically, this court cannot on an application for a rehearing proceed to make final disposition of the cause; even though oral argument was allowed on the application for the rehearing.

3. The contract describes the object sold, as follows: "Two crops of oranges on my place, as follows: i. e., 1st, all oranges that my trees may produce in the year 1899; 2d, all oranges that my trees may produce in the year 1900." The price was a lump sum, one-half of which was paid in cash and the other half stipulated to be paid at a fixed date, with no stipulation for return in case the crops should not materialize. The purchaser assumed all risks, and the seller agreed to furnish the carts and teams and drivers to move the two crops. The value of the future crops was not shown, but it appeared that the purchaser had been in the habit of buying future orange crops on a speculation, some of which he had lost totally from cold weather, which was the one thing to be dreaded and which was the main if not the only cause of the future crops being uncertain and contingent. Cold weather had been known to kill the trees half way down but never totally. The trees themselves having been killed by cold in the winter preceding the season in which the first crop was to be produced, *held*, that the sale was of the hope of the crops, and not of the crops themselves; and that the purchaser cannot recover back the part of the price paid, and must pay the part unpaid.

APPEAL from the Twenty-second Judicial District, Parish of Plaquemines—*Hingle, J.*

*James Wilkinson* (*E. Howard McCaleb* of counsel) for Plaintiff, Appellee.

*Thomas M. Gill* and *Charles G. Gill* (*Henry Denis* of counsel) for Defendant, Appellant.

The opinion of the court was delivered by BLANCHARD, J.

On application for rehearing by PROVOSTY, J.

On the rehearing by PROVOSTY, J.

BLANCHARD, J. Plaintiff is an orange merchant of New Orleans, in the habit of purchasing the produce of orange orchards in Louisiana in advance of the growth and maturity of the crops.

Defendant was the owner of an orange orchard, and in November, 1898, he agreed to sell to plaintiff, and the latter to buy, the oranges which his orchard would produce in the years 1899 and 1900.

The agreement was reduced to writing and is as follows:—

"I have this day, in consideration of the terms hereinafter named, sold unto Vincent Losecco of the City of New Orleans, two crops of oranges on my place as follows, *i. e.*:

"1st. All oranges that my trees may produce in the year eighteen hundred and ninety-nine (1899).

"2nd. All oranges that my trees may produce in the year nineteen hundred (1900).

"For the sum of eight thousand dollars ($8000).

"Four thousand dollars paid cash down and the balance four thousand dollars to be paid on the 1st day of December, 1900. Purchaser assumes all risks. Vendor to furnish teams and carts and drivers to move the two (2) crops."

This was signed by both parties.

The plaintiff (Losecco) paid the four thousand dollars stipulated for.

In February, 1899—on the 12th, 13th and 14th days thereof—less than three months from the execution of the contract aforesaid, there occurred an unprecedented freeze, the thermometer going down to seven degrees above zero in the City of New Orleans and eight degrees above in the Parish of Plaquemines, below the city, where defendant's orange orchard was situated.

This freeze, plaintiff alleges, killed and utterly destroyed the orange

trees of defendant. The latter admits this in his answer, and the proof establishes it.

Because of the utter destruction of the orchard and no possibility of the production of any crop thereon in the contract years, plaintiff demanded the return of the $4000 he had paid.

This was refused and the present suit followed.

The allegation is made that a freeze such as that which destroyed the orchard was never considered nor contemplated by the parties in making the contract, since no orange groves in the section of country where the one in question was located had ever before been destroyed by cold.

The destruction of defendant's grove is ascribed to a fortuitous event, an act of God, and by reason thereof the cause or consideration of the contract is averred to have wholly failed, entitling plaintiff to the relief sought.

Resistance is made on the ground that the agreement between the parties evidences an aleatory contract.

The contention is that Losecco purchased an uncertain hope, an expectancy, a chance—classifying ungrown crops as such—and must take the consequences of his bargain. It is claimed that all risks are included by the nature of an aleatory contract, and, besides, that Losecco expressly assumed all risks.

Judgment below was in favor of plaintiff and defendant appeals.

Is this an aleatory contract?

If it be, the defense is good against plaintiff's alleged right of recovery.

"A contract," says C. C. 1776, "is aleatory or hazardous when the performance of that which is one of its objects depends on an uncertain event. It is certain when the thing to be done is supposed to depend on the will of the party, or when in the usual course of events it must happen in the manner stipulated."

Judged by this definition of the law, the contract under consideration is not an *aleatory* one, because the performance of that which was one of its objects—the growing of oranges—did not " depend on an uncertain event," within the meaning of the Article of the Code.

It is a " certain " contract, in the sense of the Article, because " in the *usual* course of events it must happen."

The cold of February, 1899, which killed all the trees of the grove

and prevented the happening of the event—the growing of the crops of oranges in 1899 and 1900—was *unusual* in the course of events, was phenomenal and extraordinary. The evidence establishes this.

There had been cold weather—very cold weather for an orange growing country—in certain years, attended with destruction of the orange crop of the years when occurring, and sometimes with partial destruction of the orange trees—the killing of the upper and outstanding twigs and branches, requiring trimming and pruning. There, too, was one year, 1895, when it is said by one witness that about half of the orange trees were destroyed.

But the total destruction of entire groves of orange trees had not been known since, certainly, the year 1830, when, as we are vaguely informed by Martin's History of Louisiana (new edition, continuation by Condon), "the severity of the winter * * * destroyed the orange trees."

The evidence discloses that for days following the great freeze of February, 1899, the remarkable spectacle was presented of ice floes in the Mississippi river passing the City of New Orleans, borne by the river's current to the Gulf of Mexico, and that some of the blocks of ice were from twenty to thirty feet in length by from ten to fifteen feet thick.

It does not appear that the like was ever known before on the lower stretch of the river.

It is shown that the temperature at the time of the freeze of 1899 was from six to seven degrees lower than ever before—the lowest point reached prior to that time, of which any information is given, having been in 1895 when the thermometer registered fourteen degrees above zero.

The principal witness for the defense, who has lived in the Parish of Plaquemines for twenty-five years, and who seems to have kept a record of the cold of the winters, admits that he had never known of a freeze in the parish which approached that of February either in intensity or duration.

We are justified, then, in holding that the contract between these parties litigant was "certain," as contradistinguished from "aleatory," in the meaning of the law, since in the usual course of events it must happen that the trees composing defendant's orange grove, or at least some of them, would have continued to exist during the contract

years, and that their total destruction by the freeze in question must be considered as *unusual* in the course of events.

Defendant sold by the contract *"two crops of oranges."* He did not sell the hope, or the chance of two crops.

What he sold was oranges, and what he must be understood as warranting was that his trees would be there to do their part towards growing oranges. Lanata vs. O'Brien, 13 La. Ann. 229. The contract certainly contemplated the continued existence of the trees, for the language is "all oranges my trees may produce in the year 1899; all oranges my trees may produce in the year 1900."

The trees, however, disappeared, ceased to exist, were not there to produce oranges, or to make the effort of nature to produce oranges.

But it is said "the purchaser assumed all risks." True, those words are in the contract, and are not to be read out of it. On the contrary, they meant something and effect must be given to them.

We differ from defendant's counsel only in the scope of their meaning.

They are to be considered as meaning all usual, known, or foreseen risks that may attend the inception, growth, development and maturity of the orange crop.

This assumption of risk is held to apply to the thing sold, viz:—the orange crop of each year; not that which was to produce the crops—the trees themselves.

Plaintiff took his chances on the crops, whether bountiful, or meagre; whether of good quality, or bad.

His risk may have included all the vicissitudes of the season as to the effect of same on the orange crop proper. If the season were such that only an orange or two were produced in the grove, the same would have been "the crop" of the year and that was what he bought and he would have no cause to complain. It may be that he took his chances as to whether there would be any oranges grown at all, the trees remaining.

But his risk can not be extended to an inclusion of the life of the trees themselves.

The contract meant they were to remain *in esse,* to afford the orange crops which plaintiff purchased an opportunity to grow.

Plaintiff did not purchase the trees; he purchased only what the trees were to produce.

If the trees had remained and afforded the oranges nature's chance to grow, the fact that they were unable to grow because of unpropitious seasons would not have availed plaintiff and he must abide his contract.

But where the trees did not remain, were all destroyed and nothing was left to afford an orange a chance to grow, the case is different.

Plaintiff took the risk only of the appearance on the trees, the growth, development and maturity of the oranges—not the risk that the orchard itself would continue to exist. See Walker vs. Tucker, 70 Ill. 527.

The contract may be likened unto a *lease* of the trees to gather the fruit they may produce in the years named.

"If," says the law (C. C. 2697), "during the lease, the thing be totally destroyed by an unforseen event * * * the lease is at an end."

If, then, the trees of defendant were destroyed by an uncontrollable event, *par cas fortuit,* or *force majeure,* it is a loss which must be held to fall on him.

It would come under the head of an unforeseen accident.

Plaintiff did not stipulate in the contract to run all chances of all foreseen and unforeseen accidents. C. C. 2743.

He stood to take all chances of foreseen accidents only.

If, following the execution of the contract, war had been declared and an invading army had occupied the country, cutting down all the trees of this orange grove, would this be considered a risk which plaintiff assumed by the words:—"the purchaser assumes all risks"? We think not.

If the great river which washed the front side of this orange grove had exerted its mighty force and engulfed the whole tract of land— not merely overflowing it, but appropriating it for its bed, causing the whole of it "to cave into the river," as the vernacular phrase is— would this come within the scope of the risks assumed by the purchaser? We can not hold so.

Yet these catastrophes would not have been more utterly destructive of the tree life of this orange orchard than was the freeze of February, 1899.

The destruction of the orange trees was the destruction of the subject matter on which the contract was to operate.

The term *vis major* (superior force) is used in the civil law the same way that the words "Act of God" are used in the common law.

These are not considered included in the assumption of risks such as that here disclosed. To be held so included it must clearly appear that such was the intention of the parties. C. C. 1933, 2743, 2219, 2120, 2697, 2754, 2939, 2970; 120 U. S. 731.

When the orange grove of defendant ceased to exist, the contract between him and the plaintiff became a contract "without cause" in the meaning of C. C. 1897 which says:—"The contract is also considered as being without cause when the consideration for making it was something which, in the contemplation of the parties, was thereafter expected to exist or take place, and which did not take place or exist."

Here the consideration for making the contract, on part of the plaintiff, was the orange grove from which he expected to derive a crop of oranges in each of the contract years. He and defendant certainly expected the grove "thereafter to exist"—to continue to exist following the execution of the contract and for the two years of the life of the contract. But the grove did not continue to exist, and, thus, the consideration or cause of the contract failed. See C. C. 1899; Mayor vs. Caldwell, 14 L. 501; Hall vs. School District, 24 Mo. App. 213.

"Where the consideration or cause of the contract," says C. C. 1898, "really exists at the time of making it, but afterwards fails, it will not affect the contract if all that was intended by the parties be carried into effect at the time." It surely cannot be claimed that all that was intended by the parties to this contract at the time of its execution has been carried into effect, nor that all that was intended *was carried into effect at the time.*

"When the certain and determinate substance," says C. C. 2219, "which was the object of the obligation, is destroyed * * * so that it is absolutely not known to exist, the obligation is extinguished * * *."

Here, the "certain and determinate substance" constituting the object of the contract was a grove of orange trees. Its destruction carried with it the destruction of the obligations growing out of the contract.

Thus, if plaintiff were to sue defendant for the crop of oranges in

the year 1899, had in contemplation in this contract, or were to sue him for damages because no crop of oranges was delivered that year, he could not, under the terms of this law, recover. See also C. C. 1933, clause 2.

So, too, if Losecco had not paid in advance part of the purchase price and were, at the end of the contract period, sued for the whole of the $8000 he stipulated to give for the two crops of oranges, no recovery against him could be had.

The orange grove having been destroyed by a fortuitous event, a *vis major*, the purchaser of the crop of oranges which the grove was expected to grow in the contract years had the right to recede from the contract. This being so, the seller is bound to make him restitution of that portion of the price received. C. C. 2497, 2301, 2302, 2304.

The judgment appealed from is found to be correct and is affirmed. The CHIEF JUSTICE and Mr. JUSTICE MONROE, dissent

## ON APPLICATION FOR REHEARING.

PROVOSTY, J. Defendant owned an orange grove in the Parish of Plaquemine, about sixty miles south of the City of New Orleans. Plaintiff was, and had been for twenty-five years, an orange crop buyer. He had frequently bought orange crops in advance, some of which, as a result of cold weather, had failed entirely. Plaintiff had been known to buy crops as far in advance as three years.

The parties entered into the following contract:—

"I have this day, in consideration of the terms hereinafter named, sold unto Vincent Losecco, of the City of New Orleans, two crops of oranges on my place, as follows, *i. e.*:

"1st. All oranges that my trees may produce in the year (1899) eighteen hundred and ninety-nine.

"2nd. All oranges that my trees may produce in the year (1900) nineteen hundred.

"For the sum of eight thousand dollars ($8000.)

"Four thousand dollars paid cash down and the balance four thousand dollars to be paid on the first day of December, 1900. Purchaser assumes all risks. Vendor to furnish teams, and carts, and drivers, to move the two crops."

Within three months after the execution of this contract, and, therefore, during the same winter, and before the trees had had a chance to even put out the blossoms for the crop of 1899, a freeze came and killed the trees, root and branch. Cold weather had been known to destroy the crops of the year, and even kill the trees half way down, but never, within the memory of the oldest inhabitant, had the trees been killed entirely, or even so injured as not to produce a crop the following year. In the several histories of Louisiana mention is made of such a killing frost having occurred in 1748, 1768 and 1830, but whether the trees then killed were so far south as these of defendant's, does not appear; and nothing shows that the parties, when they entered into their contract, had any knowledge of these events of the distant past.

Plaintiff claims back the $4,000 paid under the contract, and defendant demands in reconvention the $4,000 payable on the 1st day of December, 1900.

Plaintiff contends that the subject of the sale was the future crops, and that the contract was conditional upon these crops eventually coming into existence, and that the failure of this condition annuls the contract.

He contends further that so long as crops continue to be attached to the realty, they are part of the realty and belong to the owner of the soil, and if they perish by *cas fortuit extraordinaire, or vis major,* their loss falls upon such owner, and not upon the purchaser, unless the latter has specially assumed such risk; the presumption, otherwise, being that he has assumed only ordinary risks.

Defendant contends that the subject of the sale was not the crops themselves, but only the hope of them, coupled with the right to take them in case they materialized; and that even if the sale was of the crops themselves, plaintiff assumed the risk of their loss.

We do not see how the doctrine of the immobility of growing crops can cut any figure in the case. If the sale was of the hope merely, then plaintiff got what he bargained for, and there is an end of the matter. If, on the other hand, the sale was of the crops themselves, then the loss must fall upon one or other of the parties according to the interpretation placed upon the risk clause. It can not be and is not contended that the plaintiff could not validly assume the risk of

the trees being destroyed by cold—the question must be, therefore, simply whether or not he made the assumption.

It was possible under our Code for the parties to make either the crops themselves or the hope of them, the subject of their contract. Civil Code, Articles 2450, 2451.

Had they made the crops themselves the subject of their contract, the sale, in the absence of contrary stipulation, would have been conditional upon the crops eventually coming into existence, as contended by plaintiff. Duranton, Vente, Nos. 169, 171, 172; Troplong, Vente, No. 240; Delsol, Vente, Art. 1, pp. 28 and 29; Pothier, Vente, No. 132; Baudry-Lacantinerie, Vol. II, No. 842.

Had they made the mere hope of the crops the subject of their contract, the sale would have been proof against all eventualities, as contended for by defendant. Same authorities. Also Baudry-Lacantinerie, Vente, No. 97; Laurent, Vente, No. 99.

Plaintiff argues that even if the sale was merely of a hope, there went along with it a certain warranty of the continued existence of the trees during the time required for the production of the crops. That even in the case of the sale of the cast of the fisherman's net, which is the example given by the Code as an illustration of the sale of a hope, there goes with the sale a warranty that the net shall continue in being until the time shall arrive for the casting of it; and in support of this plaintiff quotes as follows:

"Celui qui me vend un coup de filet guarantit que le filet sera jeté, et que la totalité de son produit me sera remise; si donc le pêcheur refuse de jeter son filet ou de me remettre la totalité du poisson qui en provient, on déterminera l'étendue de cette garantie: savoir, au premier cas, en estimant l'espérance du coup de filet, et au second cas, en estimant le poisson que le pêcheur refuse de livrer. Il n'en sera pas de même de la vente de fruits avenir; car s'il ne provient aucun fruit, le prix convenu ne sera pas dû. La raison en est que cette sorte de vente est toujours censée faite sous la condition, *Si fructus nascuntur.*" Dictionaire de Digeste, Thevenot Dessaules, T. 1. Vo. Eviction, p. 266.

We do not think that anything further is meant here than that the fisherman warrants that he shall not refuse to cast the net, or to give up the fish.

The seller of a hope has satisfied his obligations fully and com-

pletely when he has executed the act of sale; delivery accompanies the act and nothing further remains for him to do. The hope is a presently existing incorporeal thing, and since it is, of itself and separately from the thing on which it bears, made merchantable by the Code, its sale cannot be differentiated from the sale of any other thing, corporeal or incorporeal. Of course the seller warrants that the basis of the hope is not illusory, that is to say, he warrants that there is in reality an existing hope, and that he is the owner of it; but so does the seller of a horse warrant that there is a horse, and that he is the owner of it. The horse must be actually delivered, whereas the hope can not be delivered, and hence delivery accompanies the act of sale; but beyond this there is no difference between the two sales. The vendor of the hope no more warrants the continued existence of the hope, or of the conditions serving as the basis of it, than the vendor of the horse warrants the continued existence of the horse.

The question of whether the crops, or the mere hope of them, was the subject of the sale, is to be determined by the terms of the contract read in the light of the attending circumstances.

Chief among these, according to the unanimous sentiment of the civil law writers, is the comparison between the price agreed upon and the value of the thing, the inference being one way or the other accordingly as the disparity between price and value is wide or narrow.

Unfortunately, in this case, the question of this value has been left by the evidence as much in doubt as the main question itself by the contract. Both sides argue from this value in favor of their own theory, one placing the value low, and the other high.

Plaintiff proved that the crop of 1898 was sold for $2700; but at what stage of the growth of the crop this sale was made, and whether the purchaser assumed any risks, as in the present case, is not shown. Plaintiff proved in addition that the entire plantation of the defendant is assessed at $3000; also that it is four acres in width. Also, by the owner of the adjoining plantation, defendant's witness, that the orange grove does not extend further back than from five to six acres. Also that defendant bought 1 by 40 of the 4 by 40 acres composing his plantation in January, 1898, for $1000. But the witness admits that he might be mistaken as to how far back the

grove extends, and this court is aware that property is sometimes underestimated on the assessment rolls; and nothing shows that any part of the grove is on that part of the plantation bought in 1898; although in the latter case the acreage of the grove would have to be extended much further back to make room for the 12,000 trees, of which 6000 bearing trees, which, according to defendant, compose the grove.

To prove this large number of trees, and to overcome the strong circumstantial evidence offered by plaintiff, going to establish a small acreage for the grove, the only evidence offered by defendant is the following, which we copy verbatim:—

"It is admitted that Gregory, who is present, would swear that he had on his farm altogether 12,000 trees. About 6000 of which were bearing trees."

The age of the trees seems to be conceded to have been 8 years. As to what is the value of the average yield of an orange tree of that age there is no evidence.

Plaintiff's counsel point to the small acreage of the grove, deducing from this exiguity a small number of trees; and point to the small value of the plantation, as appears by the assessment rolls and by the sale of January, 1898; and, finally, point to the price of $2700, for which the crop of 1898 was sold; and argue that $4000 was approximately a full price for the crop itself.

Defendant's counsel claim that a distinction is to be observed between an admission that an absent witness would make a certain statement, and an admission that a witness present in court would make a certain satement; that the one admission is made under stress of circumstances, to avoid a continuance of the case; whereas the other admission is made voluntarily, and because the party making it finds himself unable to controvert the fact on which the statement bears; that the latter admission is in the nature of an acknowledgment of the correctness of the statement. Basing themselves on this, counsel assume that the proof shows that there were in the grove 6000 bearing trees, and counsel argue that as the product of each tree was worth $5.00, the total crop was worth $30,000; and that the fourth of this would be a value large enough to have induced the plaintiff to pay $4000 for the crop as a speculation, he assuming the risk of the non-materialization of the sum.

We can see no good reason why the admission that a witness would make a certain statement should be stronger evidence than the statement itself would be if made by the witness; and dealing with the case as if defendant had made the statement in question, we must hold that this unsupported statement is not sufficient to overcome the strong showing made by plaintiff as to the probable number of these trees. Therefore, not knowing with any degree of certainty what was the number of the trees, and knowing still less what was the value of the average crop of an orange tree eight years old, we are not in a position to establish a comparison between the value of the crops and the price of the sale.

Another circumstance on which defendant places reliance is the fact that plaintiff had made it part of his business to buy orange crops in advance, on a speculation, as he himself testifies. He was a speculator in orange crops, says defendant, assuming all risks and securing thereby a material reduction in the price.

But there is no proof as to how the prices of the crops thus bought in advance compared with the value of the crops after maturity; nor is there any proof that payment was exacted for the lost crops, nor of any local custom in that connection. Orange crops, like all other crops, vary in quantity and quality, affording a margin for speculation irrespective of the risk of total failure from extreme cold; and, besides, assumption of risk of loss of crop would not necessarily mean assumption of risk of loss of grove. Then, again, there is a broad and marked distinction between the purchase of a crop in advance and the purchase of the hope of the same crop. As already stated, the one sale is valid only if the crop materializes; whereas the other is valid whatever befall. These previous purchases go to show that plaintiff must have been well up in the knowledge of what risks an orange crop was exposed to, but do not show that he consented to assume risks so extraordinary as to amount clearly to *vis major* or *cas fortuit extraordinaire*.

The salient feature of the case outside of the contract itself is that the obvious thing for the parties to deal about was the crops themselves and not the the mere hope of them; and that therefore the natural inference would be that they had made the crops and not the hope the subject of the sale.

Coming to the contract, there is no denying that the wording of it

is peculiar; after the statement that what is sold is two crops of oranges there is added, as if by way of explanation, the *videlicet,* "all the oranges that my trees may produce," not what the trees *will,* but what they *may*—the use of the subjunctive form of the verb expressing uncertainty, implying that the trees might and might not produce any oranges, and that the plaintiff took his chances in that regard; and there is no denying that this peculiarity of language, when considered in connection with the sweeping assumption of risks, gives rise to an implication of considerable strength that the mere hope of the crops was the subject of the sale.

Of course, if given the latitude of construction that its terms call for, this clause of assumption of all risks would show beyond a peradventure that nothing more than a mere hope was sold; for, one who assumes literally *all* risks does not buy anything more than a mere chance; but when we come to consider later on in another connection the extent of the assumption of risks under this clause, we shall show, we think, that clauses couched in such general terms are not to be construed according to their very letter, but according to what, under all the circumstances of the matter, was most probably the intention of the parties; and that by this clause the purchaser did not intend to assume any other risks than such as the crops were at that time supposed to be liable to. So construing this clause, the theory of the sale's having been of nothing more than a mere hope, finds neither in the surrounding circumstances, nor in the terms of the contract any support other than the implication arising, as stated, from the peculiarity of the wording of the contract.

The implication stops short of legal certainty. It leaves the mind in doubt; and hesitation in the premises must forebode failure to the defendant's theory. "The seller," says the Code, Article 2474, "is bound to express himself clearly respecting the extent of his obligation; any obscure or ambiguous clause is construed against him."

We do not forget that the rule of interpretation by which uncertainty is construed against the vendor, is to be applied only in last resort, when all other means of knowing the intention of the contracting parties have failed; but has that extremity been reached in the present case? Have we not, both on the submission of the case and on this application for a rehearing, exhausted all known

means of interpretation in the vain endeavor to reach a satisfactory conclusion on this question.

We shall give heed to the conservative wisdom of our predecessors who, after deciding against the vendor in a case of considerable analogy with the present one, added the following:—

"But even were the case doubtful with us, we would come to the same conclusion. The price stipulated for plaintiff's pretensions was a large one, and in case of doubt would incline in favor of a party striving to avoid a loss against one seeking to obtain a gain." McDonald vs. Aubert, 17 La. 446.

A consideration of this kind does not look strong from the standpoint of pure logic, but it addresses itself strongly to the conscience of the court.

Relinquishing as hopeless the attempt to determine—except by means of the presumption enforced above—the question of what, as between the crops themselves and the mere hope of them, formed in reality the subject of this sale, we address ourselves to the task of ascertaining what risks the parties intended that the purchaser should assume; in other words, what scope should be given to the clause, "purchaser assumes all risks."

Writings designed to express the conditions of an agreement are not to be read in the abstract, and to be construed by mere verbal criticism, but are to be read in connection with the facts of the case, and to be construed according to what, all things considered, was most probably the intention of the contracting parties.

The clause now in question, for instance, taken in its literal meaning, would embrace such unforseen risks as those pointed out in our original opinion, namely, the invasion of the country by a foreign foe, or the irruption of the mighty river flowing near by, and the consequent destruction of the grove; and yet it must be clear to any one that nothing could be more improbable than that the contractants should have given a single thought to any such contingencies as these, in connection with their contract. The clause then is not to be construed according to its literal meaning.

"However general may be the terms in which a contract is couched," says Article 1959 of the Civil Code, "it extends only to the things concerning which it appears the parties intended to contract."

"The reason of this rule," says Pothier, Obligations, No. 86, "is

evident. The contract being formed by the will of the contracting parties, it can have effect only in regard to what the contracting parties have intended, or have had in contemplation."

Our question then is, what risks did the contracting parties have in contemplation; or, more specifically, did they have in contemplation a freeze which, occurring before the end of the same winter, would cut off the crops bargained for? That question resolves itself into another—had such a thing happened before?

Insofar as the cutting off of one crop is concerned, it had. According to plaintiff's witness, Martin, the crop of 1881 failed as the result of a freeze that occurred on the 10th of January, 1881; and it failed entirely. The freeze that cut off the crop of 1899 came on the 12th-14th of February, one month later than that of 1881. True, seventeen years had gone by without a recurrence of this experience, but speculators in orange crops had nevertheless to keep note of it and govern themselves accordingly. It had to enter as one of the prime factors in their calculations. They had to know that what had happened might happen again, and that the crop ran the risk; and that the purchaser would assume it if he assumed the risks to which the crop was exposed. This fatal freeze of 1881 had happened within plaintiff's own experience, and therefore he had double reason to know of it, and to be guided accordingly; and besides there had been other years when the temperature had fallen low enough to kill the crops, notably in 1886 and 1895. We hold that plaintiff assumed this risk, and that he must abide the consequences.

But in his twenty-five years experience plaintiff had not known the trees to be killed, nor even to be so injured as not to produce a crop the following year, nor had the oldest inhabitant known of such a thing. Some of the trees on the adjoining farm were thirty-eight years old. Under the circumstances, we think it would be putting a most strained construction on the situation to hold that the parties in making this contract took into consideration the contingency of the trees being thus killed or injured. The most prudent and cautious speculator would hardly have done so. If he had thought of the matter at all he would have assumed that nature would not deviate from her usual course. We hold, therefore, that the parties did not contemplate this risk, and that, as a consequence, plaintiff did not take it upon himself.

We have to assume that the degree of cold which proved fatal to the crop of 1881 proved equally fatal to that of 1899; and that, therefore, the crop of 1899 would have been cut off just the same if the temperature had not gone lower than in 1881. . This being so, the loss of the crop is to be attributed to the fact that the temperature fell as low as in 1881, and not to the fact that it fell lower. The excess of cold beyond the degree of 1881 is, therefore, immaterial insofar as the loss of the crop of 1899 is concerned. If the trees had not perished the crop would have failed just the same as in 1881; at least we are bound so to assume.

The same is not true of the crop of 1900. For the freeze of February, 1899, to cut it off, a lower, and for aught we know a much lower, temperature was required than the degree attained in 1881. The freeze of 1881 did not prevent the crop of 1882. And we have to assume that if the freeze of 1899 had not been greater, and for aught we know very much greater, than that of 1881, or any of the other frost years, the crop of 1900 would not have failed.

If we had held the sale to have been of the hope of the crops, all risks of whatsoever nature would have fallen to the lot of the purchaser, under the maxim, *res perit domino;* but holding as we have done that the sale was of the crops themselves the legal situation is that the vendor warranted the continued existence of the grove during the time required for the production of the crops, and that he is relieved of this warranty only to the extent that the purchaser assumed the risk of the loss of the crop. Between the lease of a grove and the sale of the future fruits of the same grove there is a close anology; both contracts purport to procure to the taker the fruits of the grove in consideration of a fixed sum of money. The destruction of the grove would annul the lease and for the same reason a destruction of the grove ought to annul the sale. A lessee may assume the risk, but a clause by which he should have assumed "all risks of whatsoever nature, including those of an extraordinary character" would not be construed as an assumption of the risk of the destruction of the leased premises, in whole or in part. The intention to assume such a risk would have to be "clearly manifested," and the assumption would have to be "restrictively construed." Marcadé, Com. on Art. 1773, C. N.

Oral argument having been allowed and heard on the application

for rehearing, it is considered that the case is before the court for final action as fully as though a rehearing had been formally granted.

It is therefore ordered, adjudged and decreed that the decree heretofore entered in this case be set aside insofar as it condemned the defendant to restore the four thousand dollars paid for the crop of 1899, and condemned defendant to pay the costs of suit; and that said decree be maintained insofar as it rejected the reconventional demand of the defendant. And it is further ordered, adjudged and decreed that the plaintiff's suit be rejected with costs in both courts.

Rehearing refused.

NICHOLLS, C. J., is of the opinion that the contract in question was an aleatory contract of sale of a hope—he therefore concurs in the decree insofar as it relieves the defendant to return to plaintiff the portion of the price received, but dissents from that portion of the decree which relieves the plaintiff from payment of the balance of the price.

BLANCHARD, J., dissents insofar as the judgment appealed from is disturbed by this decree, adhering to the opinion and decree first handed down by this court.

BREAUX, J., dissenting, handed down a separate opinion.


## ON REHEARING.

PROVOSTY, J. Ordinarily, when oral argument is heard on application for a rehearing, the court, in passing upon the application, proceeds to make final disposition of the cause. This having been done in the present instance, plaintiff complained that the case had been decided without affording him a hearing; and, as the complaint was technically well founded, the court set aside the judgment, and fixed the case for a hearing, and for a third time heard oral argument.

Plaintiff also complained that a majority of the court had not concurred in the judgment; the complaint was unfounded; three members of the court had concurred in the decree rejecting plaintiffs demand, and three had concurred in the decree rejecting the reconventional demand.

One member of the court has been of the opinion from the beginning that this contract evidences the sale of a mere hope. Two other members of the court reached early the conclusion that the contract

evidenced the sale of future crops. The two other members of the court, as the court is at present constituted, would not have hesitated to give to the clause of assumption of all risks the broad latitude its letter calls for, if the crop of only the first year had been involved; but to give it this latitude in connection with the crop of the second year seemed to make the purchaser assume risks which, in all probability, had never enered his contemplation, and this seemed repugnant to the spirit in which contracts are usually interpreted. However, had the choice lain between, on the one hand, relieving the purchaser from the risks which he had certainly assumed in connection with the crop of the first year; and, on the other hand, charging him with the risks which probably he had not thought of assuming in connection with the crop of the second year, these two members of the court would not have hesitated to enforce, as to both crops, the clause of assumption of all risks. It is impossible to read the decision handed down on the rehearing without being impressed with the fact that nothing but the strong repugnance on the part of these two members of the court to saddle the purchaser with a risk which in all probability had not been contemplated by the parties, kept them from adopting the view that the contract evidenced the sale of a mere hope. Further consideration of the matter has convinced them that the sale was of the mere hope of the crops.

The question of the distinction between the sale of a future crop, as contradistinguished from the sale of the mere hope of such crop, is treated more or less copiously by all the French writers on the civil law; and it may be well to insert here some extracts from their books, taken from the places referred to in the opinion handed down on the rehearing.

Pothier says: "Il ne peut, a la vérité, y avoir de contrat de vente sans qu'il y ait une chose vendue; mais il suffit que la chose vendue doive exister, quoiqu'elle n'existe pas encore. Par example, tous les jours nous vendons avant la récolte le vin que nous recueillerons; cette vente est valable, quoique la chose vendue n'existe pas encore; mais elle dépend de la condition de sa future existence; et si la chose vient à ne pas exister, et si l'on ne recuille pas de vin, il n'y aura point de vente.

"Une simple espérance peut même être l'objet d'un contrat de vente;

c'est pourquoi si un pêcheur vend à quelqu'un son coup de filet pour un certain prix, c'est un vrai contrat de vente, quand même il arriverait qu'il ne prit aucun poisson; car l'espérance de poisson qui pourraient etre pris est un être moral qui est appréciable et peut faire l'objet d'un contrat."

Pothier, Contrat de Vente, Sec. 5.

Duranton says: "It n'est pas necessaire, au surplus, que la chose que l'on vend existe au moment même de la vente; il suffit qu'elle puisse exister, comme des fruits à naître, le produit espéré d'un coup de filet ou d'une opération commerciale.

"Quant à la vente d'un coup de filet, comme ce n'est que l'espérance de ce qui sera pris de poisson qui est l'objet de la vente, il est clair que quand bien même il n'y aurait rien de pris, la vente ne devrait pas moins recevoir tout son effet; le prix convenu ne devrait pas moins être payé en entier. Et si le pêcheur ne voulait pas jeter son filet, ou livrer ce qu'il a pris, il y aurait lieu contre lui à l'action *ex empto,* pour obtenir les dommages—intérêts.

"Mais si j'achetais d'un pêcheur, à tant la livre, le poisson qu'il prendra dans sa journée, il n'y aurait pas de vente, s'il ne prenait rien. La vente serait conditionelle comme dans le cas de l'article 1585. Du reste, il serait obligé d'exécuter le marché, et, s'il ne voulait pas pêcher, j'aurais action contre lui pour obtenir mes dommages intérêts.

"Dans le cas de vente des fruits que produira tel fonds en telle année, il importe de destinguer si les parties *ont entendu faire un contrat entierement aléatoire,* traiter *de spe fructuum nasciturorum,* ou-bien si elles ont voulu seulement traiter d'une récolte à venir, en ne faisant consister *l'alea* que sur le plus ou le moins de fruits. Si c'est *comme simple espérance* que les fruits à naître ont été vendus, il y a vente, et le prix doit être payé, quand bien même il ne naîtrait rien, ou presque rien, ou que la récolte serait entièrement detruite par la grêle ou autre accident.

"Mais si c'est comme récolte à faire sur tel fonds en telle année que les fruits à naitre ont été vendus, il n'y a pas de vente, faute d'objet, s'il ne naît rien ou presque rien, ou si, par quelque autre cause, il n'y a point ou presque point de fruits (car dans l'ordre moral, presque rien et rien sont la même chose)."

Duranton, Du Contrat de Vente, Secs, 169, 171, 172.   (Italics are ours).

Troplong says:

"On peut vendre, non seulement les choses qu'on possède actuellement, mais encore celles qu'en peut avoir pas la suite.

"En effet, les choses futures sont du ressort de la vente.   Le jurisconsulte Pomponius en donne pour exemple la vente des fruits qui naîtront d'une terre, et celle du droit d'un animal. Nous ajouterons, la vente de produits qui seront fabriqués dans une manufacture. Une telle vente est conditionelle.   Elle ne se réalise qu'autant que les fruits viennent à naître, et alors elle produit un effet rétroactif au jour du contrat, comme nous l'enseigne le même Pomponius.   Mais si l'année est entiérement stérile, il n'y a pas de vente.

"On peut même traiter par achat et vente d'une espérance, d'une chance incertaine, comme un coup de filet.  Ecoutons encore Pomponius : *'Aliquande tamen sine re (physica scilicet,* dit Pothier en rappelant ce texte), *venditio intelligitur, veluti quum quasi alea emitur.   Quod fit quum coptus piscium vel avium vel missilium emitur.   Emptio enim contrahitur etiamsi nihil inciderit, quia spei emptio est."*

"C'est vente de ce genre que celle par laquelle on vend à quelqu'un le droit de percevoir les fruits de tel immeuble, *et il ne faut pas la confondre avec la vente des fruits qui naitront,* dont nous avons parlé au précédent.   *"Multum interest,'* dit Favre, *'an fructus quis vendat qui ex eo fundo noscentur, an vero perceptionem fructuum ex eo fundo.  Priore casu quasi conditionalis venditio est, quae non nisi notis fructibus perfecitur; ideoque si nulli fructus, eo anne, ex illo fundo provenerint, nihil venditori debetur.   Posteriore vero, pura emptio est, et alea potius quam certa aliqua res empta intelligitur.'*

"En effet, le droit de percevoir les fruits contient une chance implicite et nécessaire, que le propriétaire fait passer au vendeur.   Ce droit est subordonné aux intempéries des saisons; il varie dans son étendue, suivant que l'année est plus ou moins heureuse; quelquefois même il se trouve réduit à rien.  C'est donc *une incertitude qui a fait l'objet du contrat, et l'acquéreur droit en courir les hasards;* mais il est autrement quand l'acheteur a voulu acheter conditionellement une chose future, et son intention n'est pas douteuse lorsque, comme dans le cas

dont nous parlons, il s'est servi d'expression conditionelles; les fruits qui naîtront."

Troplong, De la Vente, Sec. 204.

Baudry-Lacantinerie says:

"La première regle résulte de l'art. 1130, aux termes duquel 'les choses futures peuvent etre l'objet d'une obligation. On peut donc vendre une chose future, c'est-a-dire une chose n'existant pas actuellement, mais dont l'existence est possible dans l'avenir. Ainsi je puis vendre en tout ou en partie la récolte de vin ou de blé que je ferai l'année prochaine dans ma propriété. Il est vrai que je puis ne récolter ni vin ni blé, la brêle ou tout autre accident peut détruire la récolte; mais il est possible que j'aie une récolte, et cela suffit pour que la vente que j'en fais ne soit pas sans objet. Il en serait autrement si, au moment de la vente, la récolte vendue était déjà détruite; alors ce serait la seconde règle qui deviendrait applicable. La vente d'une chose future est le plus souvent un contrat aleatoire; *l'alea* peut d'ailleurs augmenter ou diminuer suivant les clauses convenues. Ainsi je puis vendre ma récolte moyennant un prix ferme qui me sera payé *quoi qu'il arrive;* je puis la vendre à raison de tant le tonneau de vin ou de tant l'hectolitre de blé. Dans le premier cas, l'acheteur devra le prix convenu, memé si la récolte est nulle; dans le second gas, il ne paiera que les quantités recoltées, mais il les paiera au prix convenu d'advance, sans qu'il ait à tenir compte du cours du vin ou du blé au moment de la récolte; il y aura encore *aléa,* mais moindre."

Baudry-Lacantinerie, Contrat de Vente, Sec. 97.

Laurent says:

"La vente des choses futures est aléatoire quand les parties ont entendu vendre et acheter une *chance;* telle est la vente d'une récolte quand, dans la pensée des parties contractantes, c'est une *espérance* qui fait l'objet de la convention; qu'il y ait des fruits ou qu'il n'y en ait point, l'acheteur devra payer le prix, car le prix représente la *chance,* il ne représente pas les fruits. Quand les fruits futurs sont l'objet du contrat, il n'y aura pas de vente s'il n'y a point de fruits. Cela est élementaire."

Laurent, De la Vente, Sec. 99.　(Italics are ours).

Delsol says:

"*De la vente des choses* Futures.

"Les choses futures et qui n'ont pas d'existence actuelle peuvent-elles être vendues? L'affirmative· n'est pas douteuse; seulement il s'agira d'interpréter *l'intention des parties,* pour savoir si dès a présent elles se sont ou non definitivement liées. Ont-elles entendu ne faire le contrat que si la chose se réalisait? Alors la vente sera subordonnée a cette réalisation qui constituera une véritable condition suspensive. Ont-elles au contraire entendu contracter à *tout événement?* Alors la vente sera valable, lors même que la chose n'existerait jamais, car vente n'a pas eu pour objet la chose elle-même, mais la *chance* que cette chose existât.

"Un example montrera l'exactitude de cette distinction. Le proprietaire d'une vigne vend la récolte de l'an prochain à raison de tel prix par tonneau de vin récolté. Il est bien évident que, dans ce cas, les parties ont eu en vue la récolte elle-même, et, que si cette récolte n'existe pas, la vente est nulle faute d'objet. Mais si elles sont convenues que la vente de la récolte a lieu pour tel prix *et a forfait,* alors la vente a pour objet, non plus la récolte, mais la *chance* de la récolte, qui peut avoir, selon les circonstances une valeur très-supérieure ou très -inférieure au prix stipulé et cette vente est valable lors même que la récolte serait tout-à-fait-nulle. L'importance du prix sera l'élément principal qu'on devra consulter pour savoir si les parties ont voulu faire un contrat commutatif ou un contrat purement aléatoire."

Delsol, De la Vente, Sec. 422. (Italics are ours).

Baudry-Lacantinerie, again, says: "Ainsi je puis vendre la récolte que mon vignoble produira l'année prochaine, et je puis faire cette vente à tant la mesure, par example, à 2000 fr. le tonneau, ou pour un prix ferme, exemple; toute la récolte pour 50,000 fr.

"Dans co dernier cas, l'acheteur devra-a-t-il payer son prix, si la récolte est nulle ou a peu près, par exemple si la gelée l'a détruite ou l'a réduite à des proportions si exiguës qu'il ne vaut pas la peine de vendanger, parce que les frais absorberaient et au delà le produit? *Tout dépend de la nature de la convention faite entre les parties.* Si c'est seulement le chance d'une récolte qui a fait l'objet du contrat, alors c'est une simple espérance qui à été vendue; l'acheteur devra payer son prix, quoi qu'il arrive, même si la récolte est nulle. Il y a vante aléatoire, et la prix aura naturellement été fixé en conséquence. Quand, au contraire, les parties ont traité en vue d'une récolte future,

et non du simple espoir d'une récolte, la vente sera non avenue faute d'objet s'il n'y a pas de récolte ou s'il y a une récolte à peu près nulle; car, en droit, presque rien équivant à rien. Dans ce dernier cas, il y a vente conditionelle."

Des Obligations, Sec. 247. (Italics are ours).

Mourlon, Vol. 3, p. 193, says:

"La vente peut avoir pour objet des choses futures; par example, la récolte de tel vignoble. (Art. 1138.) Il importe alors de savoir ce qui a été vendu. Est-ce la *chance de* la récolte--*ou la récolte.* Dans le premier cas, la vente est complèment aléatoire. L'acheteur doit son prix tout entier, même en l'absence de toute récolte. Dans le second, elle est en quelque sorte. *commutative et aléatoire.* Si le vignoble donne une récolte, l'acheteur doit son prix tout entier, quoique la récolte soit peu abondante; sous ce rapport, la vente est aléatoire, car il peut y avoir une récolte très-abondante ou une très-mauvaise récolte, Mais si la récolte manque absolument, ou même si le vignoble n'a produit que quelque bouteilles de vin (car en droit, presque rien est considéré comme rien), l'acheteur ne doit pas son prix, puisqu'il l'a promis en échange d'une récolte que le vendeur ne peut pas lui livrer. Sous ce rapport, la vente est commutative.

"Mais à quel signe reconnaîtra-t-on si c'est la *chance* de la récolte ou la récolte qui été vendue? Leas circonstances éclaireront le juge. Il faut surtout comparer le prix à la valeur ordinaire des récoltes que produit le vignoble. S'il est égal ou à peu-près égal, ou suppose qu'il a été promis en échange de la récolte. S'il lui est tres-inférieur, on suppose qu'il a été accepté comme équivalent de la chance de la récolte."

From these quotations it is very evident that the question of what formed the subject of the sale, the future crop or the hope thereof, is one of what was the intentions of the parties, that is, of the interpretation of the contract. Contracts must be interpreted from the terms of the writings evidencing them and from the circumstances surrounding them. In contracts of the nature of the one here in question the main circumstance would be the comparison between the value of the crop if it materialized and the price fixed in the contract. Of the benefit of this circumstance the court is deprived in the present instance, as was fully explained in the opinion handed down on the

Losecco vs. Gregory.

rehearing. The other notable circumstances are pointed out in the same opinion; they are, on the one part, first, that the purchaser had been in the habit of buying orange crops in advance on a speculation; and that not unfrequently these crops had perished entirely from cold weather, which in that locality hung ever as a Damocles sword over the head of the orange grower; and, second, that the purchaser paid the large sum of $4000 cash, without a word of stipulation for its return on any contingency; and they are, on the other part, that never before, within the memory of the oldest inhabitant, had the trees been killed outright, or so injured as not to produce a crop the second year following; and that the purchaser stipulated that the vendor should furnish the teams, and carts and drivers for moving the two crops.

First, as to the terms of the contract. It is undeniable that the wording of the contract is peculiar, and that a strong inference arises of its having been so made advisedly. In describing the crops the vendor might have said simply, the two orange crops of the years 1899 and 1900 on my place, or the two orange crops that the trees on my place will produce in the years 1899 and 1900. Instead of this, he industriously explains what is meant by the two crops sold; after saying that he has sold two crops of oranges on his place, he goes on and adds the *videlicet; "i. e.*:

"First. All oranges that my trees may produce in the year 1899.

"Second. All oranges that my trees may produce in the year 1900."

This specification must unquestionably be held to control the more general terms made use of previously; they were inserted in the contract for that very purpose. Now, why, if simply the future crops were in contemplation, the simple future form of the verb should not have been used; why should the conditional future, or potential, form of the verb have been used, as if mere potential crops, or, in other words, the hope of crops, had been in contemplation.

In the above extracts the simple future is invariably used in describing the future crops. Thus, Potheir, "la récolte de vin que nous receuillerons," "the wine crop that we shall gather"; thus Duranton, "vente des fruits que produira tel fonds," sale of the crops that such a tract of land shall produce; thus Troplong, "vente des fruits qui naîtront," "sale of the fruit that will be produced"; thus

Baudry-Lacantinerie, "la récolte que je ferai l'annee prochaine dans ma propriété," "the crop I shall make next year on my property"; thus Delsol, "la récolte de l'an prochain," "the crop of next year"; thus Baudry-Lacantinerie, again, "la récolte que mon vignoble produira l'année prochaine," "the crop my vineyard shall produce next year"; thus Mourlon, "la récolte de tel vignoble," "the crop of such a vineyard"; thus Pardessus, "tout ce que produira le champs," "all that the field shall produce."

In all these cases the form of expression is such as to give rise to the inference that the parties had in mind a crop that would come into existence; whereas, the form "all oranges that my trees *may* produce," raises no such inference, but on the contrary, from the fact that the simple form is made to give place to this peculiar one, gives rise to an inference, and an inference at that of considerable strength, that the parties made use of the potential mood instead of the simple indicative advisedly, in order to describe crops not simply future, but also merely potential.

Delsol, in the extract above, says that the sale must be held to have been of a mere hope, where the parties have contracted *"a tout événement."* The literal translation of this would be, "at all events;" a freer and more idiomatic translation would be, "subject to all contingencies," or, "on the assumption of all contingencies," or, again, "the purchaser taking all chances," or "assuming all risks." This last translation would make this authority fit exactly the case in hand.

Baudry-Lacantinerie, in the extract above, says that the sale must be held to have been of the mere hope where the parties have contracted "moyennant un prix ferme qui me sera payé quoiqu'il arrive"; *anglice,"* "in consideration of a lump price to be paid me no matter what happens." In the case in hand the price was of that character, and the purchaser *"assumed all risks,"* which may be said to be fully the equivalent of *"no matter what happens."* This authority, again, would seem to fit the case.

The purchaser knowing full well that the crop might never materialize paid cash and unconditionally $4000, and bound himself to pay at a fixed date and likewise unconditionally the balance of the price; and he assumed all risks. On further consideration, the court is satisfied that this assumption of all risks meant that the purchaser

assumed the risk of the crops never materializing; and that, therefore, the sale was merely of the hope of the crops.

At the time this contract was entered into the defendant had the hope or chance that his orange trees would produce crops of oranges in 1899 and 1900. His chance in that regard he conveyed to the purchaser. In consideration of the price paid and to be paid, the purchaser stepped into his shoes. From that moment he had no further chance in connection with the crop and no further risk; and from the same moment the purchaser had all the chance and all the risk.

In addition to the extract from Dictionnaire du Digeste, ou Sub-stance des Pandectes Justiniennes, par M. Thevenot-Dessaules, quoted in the opinion on rehearing, going to show that the fisherman who sells the cast of his net warrants that the net shall be cast, or that the conditions essential to the casting of the net shall continue until the time comes for the casting, plaintiff's counsel quote the following:—

"Ainsi dans un cas opposé à celui que nous avons prévu No. 238, lorsqu'un pêcheur a vendu un coup de filet, si la pêche n'a pas lieu par force majeure, il sera libéré; mais celui qui lui avait promis un prix ne lui payera rein." Pardessus, Cours de Droit Commercial, 305.

This goes very far toward convincing the court that it was in error in holding that such a warranty does not accompany the sale in the case of the fisherman; but granting that the court was in error in that respect, this would not be to say that in the present case the vendor warranted the continued existence of the trees. The case can be easily distinguished from that of the sale of the cast of a net. In the latter case the hope is based on a condition of things to exist in the future, and the contract presupposes that the condition will exist; the sale is not of the hope that the net will be cast, but of the hope of the result of the casting. In the former case the hope is based on the actual existing condition of things; the seller says to the purchaser, such as my hope or chance is at the present time I sell it to you. If in the case of the fisherman a similar contract were made, that is, if the risk were made to include not only the result of the casting but also the eventuality of the net's being cast, then the case would be different, and the contract would have to be enforced as made; and the fisherman

would be liberated from warranty, saving, of course, as to his own acts.

Plaintiff quotes from Fuzier-Herman, Code Annoté, 4th Vol. Sec. 5, as follows:

"In case of a thing future and uncertain, the formation of the contract is subordinated to the realization of the thing sold, in such a manner that the non-realization of the thing renders the contract radically null for the want of an object; and it is the same when a penal clause has been added. Such a clause, far from validating the contract of sale, and furnishing it an object, participates itself in the nullity in which the contract itself is stricken."

What is there said is true only of the sale of a thing to come hereafter into existence, such as future crops; but it is not true of the sale of a presently existing thing, such as a hope. The annotation is taken from the decision of the court of Lyon in the case of Rodet vs. Lachapelle, 18th of May, 1854, reported among the decisions of the year 1855. It was the sale of some shares of the stock of a mining company thereafter to be organized, the organization of which fell through. Part of the price had been paid cash, and a penal clause inserted to provide for the contingency of the parties not complying with their contract. The suit was for the return of the price and also for the recovery of the penalty. The defendant was willing to restore the price, but not to pay the penalty. The court held that the contract of sale was null for want of an object, and that the penal clause was also null because it was an accessory obligation partaking of the nullity of the principal obligation. The case would have been different, said the court, if the sale had been of a hope, or if the vendor in addition to binding himself to sell the shares had warranted that the company would be organized. The decision itself and the annotation of the reporter of it, fully distinguish the cause from that of the sale of a hope.

As attempted to be shown in the opinion handed down on rehearing the parties clearly contemplated that the crop might prove a total failure; they had proven so before, not unfrequently; it is safe, therefore, to say that by assuming all risks the purchaser assumed this risk of total failure. From this it would follow that the clause obligating the vendor to furnish teams, carts and drivers to move the

crops is not inconsistent with the view that within the contemplation of the parties, and within the meaning of the contract, the crops might prove total failures and there be no crops to move. This clause, therefore, is not inconsistent with the theory of the sale's having been merely of the hope of the crops.

It is therefore ordered, adjudged and decreed, that the plaintiff's suit be dismissed at his cost, and that he be condemned to pay to the defendant the sum of four thousand dollars, with legal interest thereon from the first day of December, 1900, and that the plaintiff pay the costs of this appeal.

Justices BREAUX and BLANCHARD dissent, adhering to their original views.