126 So.2d 800 (1961)
PLACID OIL COMPANY, Plaintiff-Appellee,
v.
Mrs. Jane Oakley FRAZIER et al., Defendant-Appellant.
No. 9398.
Court of Appeal of Louisiana, Second Circuit.
February 2, 1961.
Jackson & Reynolds, Homer, for appellant.
Herschel M. Downs, Shreveport, for appellee.
McConnell & McConnell, Springhill, for Lillian J. Hanson, nee Frazier, and others.
Before HARDY, GLADNEY and AYRES, JJ.
*801 GLADNEY, Judge.
Placid Oil Company, pursuant to LSA-R.S. 13:4811-13:4817, filed a concursus proceeding for the purpose of determining ownership of a one-eighth royalty interest in oil purchased from two oil wells producing from the South Half of the Northeast Quarter of Section 17, Township 23 North, Range 11 West, in Webster Parish, Louisiana. The legal controversy which developed concerned conflicting claims between Mrs. Jane Oakley Frazier, a resident of Minden, Louisiana, and three granddaughters of Mrs. Frazier, the children of John Dewey Frazier, namely Mrs. Mary Jane Royce, Mrs. Lillian Joyce Hansen, and Mrs. Norma Patricia Zualet, all residents of Barstow, California. Resolution of the issue involves the validity of two instruments, first, an act of donation from John H. Frazier and Jane Oakley Frazier to Mrs. Elizabeth Velasco and Mrs. Hester Reynolds, dated September 25, 1945, and second, a quitclaim deed executed by Mesdames Royce, Hansen and Zualet in favor of Mrs. Frazier, on October 18, 1956. Following a trial of the issues presented, judgment was rendered recognizing the rights of Mesdames Royce, Hansen and Zualet, and decreeing the invalidity of the act of donation and the quitclaim deed. From this decree Mrs. Jane Oakley Frazier has appealed.
Chronologically the record discloses that John H. Frazier was married but once, and then to Mrs. Jane Oakley Frazier. Of this marriage eight children were born, of whom were John Dewey Frazier, Mrs. Elizabeth Velasco and Mrs. Hester Reynolds. John Dewey Frazier died January 1, 1942, and was survived by three children, Mesdames Royce, Hansen and Zualet. John H. Frazier died November 18, 1946, survived by his widow, Mrs. Jane Oakley Frazier, and certain children and grandchildren. The above described property was acquired during the existence of the community of acquets and gains existing between Mr. and Mrs. Frazier. On September 25, 1945, John H. Frazier and his wife executed an instrument which purported to donate their real property, including that above described, to their two daughters, Mrs. Elizabeth Frazier Velasco and Mrs. Hester Frazier Reynolds, in equal proportions. On June 17, 1946, Mr. and Mrs. Frazier, Hester Frazier Reynolds, and Elizabeth Frazier Velasco, granted to J. A. Hunter, as lessee, an oil, gas and mineral lease covering the above described property, which lease as of the time of this suit was owned by Williams Drilling Company, Inc. and the oil production from said lease was being sold to Placid Oil Company.[1] Certain quitclaim deeds were executed in favor of Mrs. Jane Oakley FrazierOn August 2, 1956, from John Luther Barnette; October 18, 1956, from Mesdames Royce, Hansen and Zualet; and on October 27, 1956, from Mesdames Hester Frazier Reynolds and Elizabeth Frazier Velasco. During April, 1956, some five months prior to the execution of the quitclaim deed by Mesdames Royce, Hansen and Zualet, oil in commercial quantities was being produced from the mineral lease.
The claim of Mrs. Jane Oakley Frazier to all of the royalty, with the exception of the interests sold Boucher, is disputed solely by the three above named granddaughters from California, who assert title to a one-eighth interest in the above described property and resulting royalty by inheritance from their deceased grandfather, John H. Frazier. It must be conceded that except for the disputed act of donation and quitclaim deed the rights of said grandchildren to claim would not be in contest. In the trial the latter parties successfully attacked the validity of the act of donation and the quitclaim deed. The appeal to this court was perfected by Mrs. *802 Frazier, seeking a review of the decree which held these two instruments invalid and without legal effect.
The instrument purporting to make a donation of said property to Mrs. Reynolds and Mrs. Velasco was signed on September 25, 1945, by both Mr. and Mrs. Frazier. The act, in notarial form, reads in part:
"* * * in recognition of the personal care and affection the said daughters have and do entertain for them, and further, that in order the said daughters may obtain equal advancements and gifts as appearers have heretofore accorded their other children, they do by these presents give, grant, alien, confirm and donate inter vivos, unto the said Hester Frazier Reynolds, * * * and Elizabeth Frazier Velasco, * * *."
There follows a description of the property on which the oil is being produced and a certain lot with improvements, situated in Minden, Louisiana. The instrument contained the following reservation:
"The said donors however reserve the full and entire use and usufruct of the said properties unto themselves and to the survivor of either of themselves during their natural lives or life, the donees thereafter to have immediate and equal undivided seizen and possession of such use, usufruct and occupation of the properties."
The contention of Mrs. Frazier is that the donation was, in fact, a remunerative donation, in that the object of the gift was intended to recompense the donees for services rendered as defined by LSA-C.C. Art. 1523. Her opponents assert, however, that the purpose of the donation was gratuitous only and is reprobated by LSA-C.C. Art. 1533, for the donors reserved unto themselves the usufruct of the immovable property which was the object of the donation.
We are here concerned with a donation inter vivos. Such donations are the subject of Chapter 5 of Title II, Book III of the Revised Civil Code. A donation inter vivos is defined as an act by which the donor divests himself, at present and irrevocably, of the thing given, in favor of the donee who accepts it. LSA-C.C. Art. 1468. The Code in Art. 1523, describes the three kinds of donations inter vivos:
"The donation purely gratuitous, or that which is made without condition and merely from liberality;
"The onerous donation, or that which is burdened with charges imposed on the donee;
"The remunerative donation, or that the object of which is to recompense for services rendered."
The Code likewise provides:
"The remunerative donation is not a real donation, if the value of the services to be recompensed thereby being appreciated in money, should be little inferior to that of the gift." Art. 1525 of LSA-Civil Code.
The rules which apply to donations inter vivos generally do not apply to onerous and remunerative donations, except when the value of the object given exceeds by one-half that of the charges of the services. LSA-C.C. Art. 1526.
By virtue of the provisions of Art. 1533, if the act of donation in favor of Mrs. Velasco and Mrs. Reynolds should be held to be a gratuitous donation, it must be stricken with nullity. Opponents argue that neither the wording of the instrument nor the services allegedly rendered by the donees are sufficient to support a remunerative donation. Clearly, not all services performed by children in behalf of their parents are such as can support a remunerative donation. Where the validity of a remunerative donation is questioned, the burden rests upon the opponents to prove that the value of the property donated exceeds by one-half the value of the services rendered, or to show the donor has not reserved enough for his subsistence. Whitman *803 v. Whitman, 1944, 206 La. 1, 18 So.2d 633.
In the case of Kiper v. Kiper, 1949, 214 La. 733, 38 So.2d 507, the Supreme Court observed that services rendered to a parent by an only child are presumed to be gratuitous, but the jurisprudence was conflicting as to whether the presumption arises if there be more than one child. The court then stated:
"However that may be, where there is an expressed intention shown to compensate a child for the services rendered the presumption of gratuity does not arise." Id., 38 So.2d at page 510.
In the cited case which involved a donation mortis causa, the will provided: "Mamie Kiper has lived with me, has taken care of me and has been my sole support since the death of my husband, S. F. Kiper." In Whitman v. Whitman, supra, the instrument provided [206 La. 1, 18 So. 2d 635]: "The providing a home, clothing and feeding and in fact maintaining and supporting * * *." In Robinson v. Guedry, La.App. Orleans, 1938, 181 So. 882, the donee cooked for the donor, cleaned her house, washed her clothes and did many unpleasant tasks in connection with the care of the patient, who was a helpless old woman. The court upheld the donation. The Supreme Court held invalid a donation under attack in Almond v. Adams, 1952, 221 La. 234, 59 So.2d 132, 134. Therein, there was an attempted donation of an undivided one-half interest in a farm consisting of two hundred eighty acres to the donor's son and daughter-in-law, with reservation of usufruct by the donor. In holding that the entire donation was void ab initio, the court, upon authority of Arts. 1523-1527 and 1533-1536, found the proof was insufficient to support a remunerative donation. The wording of the donation in that case was for "care and services."
The mere performance of some services has been held to characterize a gratuitous donation where the attempted gift was inspired simply from a sense of gratitude and appreciation. Thus, the donation was held to be gratuitous in Continental Oil Company v. Tate, 1947, 211 La. 852, 30 So.2d 858, which involved the services of a priest.
In the instant case, the record discloses John H. Frazier had suffered from torticollis which caused him to discontinue farming in 1911 and move to Minden. There he established a general store in the same structure in which he had his home, and this business was operated until it was sold two or three years prior to his death. At the time of Frazier's death his widow was sixty-six years of age, and the record does not indicate her health was bad. The donees, Mrs. Velasco and Mrs. Reynolds, were born in 1917 and 1919 respectively, and both were married in 1941. They testified that they managed the store for their father prior to its sale, and performed many personal services for him, such as shaving and bathing him. Mrs. Frazier was present during all of this time, and John Dewey Frazier and John Luther Barnette likewise lived in the family home in Minden for a number of years. Mr. and Mrs. Frazier, as well as the children and grandchildren were largely, if not entirely, supported by the store. In the latter years of his life Mr. Frazier's physical condition deteriorated, but until a short while prior to his death he spent much of the time seated in a chair in the store. It is natural to infer that many of the personal services performed on behalf of Mr. Frazier were done by Mrs. Frazier, and no doubt other services were performed by John Dewey Frazier and John Luther Barnette. Mrs. Reynolds and Mrs. Velasco received their entire support from the store prior to their marriage, and afterwards they remained for a number of years in the home while their husbands were away. They were not requested to pay board and they received no salary. A careful review of the services performed by Mrs. Reynolds and Mrs. Velasco indicates that the value of said services, when "appreciated in money" and considered together with the receipt of *804 their own upkeep, was too "inferior to that of the gift". We entertain not the slightest doubt the daughters contributed largely to the personal comfort of their father, yet gauged by the wording of the act of donation, the donors, in our opinion, were prompted to so act from a sense of gratitude and appreciation. The instrument does not connote an act of remission or payment. We hold, therefore, that the donation must be classified as a gratuitous donation and hence, is invalid by reason of the provisions of LSA-C.C. Art. 1533, since the donor has reserved to himself the usufruct of the immovable property so donated.
The opponents of the donation, the granddaughters of Mrs. Frazier, executed on October 18, 1956, a quitclaim deed on the property from which oil produced from the Frazier No. 1 well had been sold, as early as April, 1956. These parties lived in California and testified they knew nothing of the production of oil from the property. Mrs. Frazier candidly admitted that she did not advise them of this. The evidence is clear that it was represented to the granddaughters that the quitclaim deed was sought for the purpose of obtaining an FHA loan to improve the condition of the Frazier home in Minden. Such a loan was never obtained and the evidence shows that as of the time the representations concerning the loan were made, the oil payments to which Mrs. Frazier was entitled obviated the need for such a loan. Had the signers of said deed known that a lucrative oil well was producing on the property, and that Mrs. Frazier was not in need of the money to make repairs to her home, we feel quite sure they would have refrained from executing the instrument.
The signatures were obtained through error and fraud. The law on this subject is aptly stated in Griffing v. Atkins, La.App. 1st Cir., 1941, 1 So.2d 445, 449. Therein an ignorant Negro man came into possession of a diamond ring valued at $1,250, and was talked into disposing of the ring for $130 to the jeweler to whom he brought it for valuation. The court set aside and rescinded the sale for error and fraud on the authority of LSA-C.C. Arts. 1819, 1832 and 1847. The court said:
"The ground on which Sims, the intervenor, seeks to set aside the sale is of course one arising out of the Articles of our Civil Code relating to error and fraud. Under Art. 1819, there are four defects of consent which will invalidate any contract entered into by the parties, viz.: `Error; Fraud; Violence; Threats.' We are concerned with the first two, but in reality this case involves the second thereof for the reason that Art. 1832 provides that: `In all cases, however, when the information, which would have destroyed the error, has been withheld by the other party to the contract, it comes under the head of fraud, and invalidates the contract.' The article relative to the nullity of contracts from fraud is Art. 1847. The preliminary statement of that article is the most important as it defines fraud, as it applies to contracts, as `the cause of an error bearing on a material part of the contract, created or continued by artifice, with design to obtain some unjust advantages to the one party, or to cause an inconvenience or loss to the other.' From this definition, the article then lays down twelve certain rules which it says are drawn therefrom. In rule 4, we find particular reference to false assertions constituting an artifice regarding objects that require particular skill or habit, or any difficult or inconvenient operation to discover the truth or falsity of the assertion; examples are given therein but they are not exclusive. Rule 5 provides that fraud arises from some false assertions made as to the value or quality of the object forming the subject of the contract or by the suppression of what is true regarding the same. Rule *805 6 provides that: `The assertion and suppression, mentioned in the last preceding rule, mean not only an affirmation or negation by words either written or spoken, but any other means calculated to produce a belief of what is false, or an ignorance or disbelief of what is true.' These rules contemplate that in a contract of sale of the very nature of the one with which we are now concerned that where the parties are on an unequal footing, and not dealing at arms length, the one possessing the superior knowledge regarding the value or the quality of the object is held to the exercise of the greatest care and caution in conducting himself and must not take undue advantage of the other party, who, as it happens in this case, is one totally ignorant of the value or quality of the object and who was attempting to obtain information relative thereto."
The record in this case clearly sustains charges that the signatures to the quitclaim deed in question were obtained through error and fraud, and, as a consequence, we find no error in the ruling of the trial judge. Therefore, it follows that the judgment from which appealed should be and is hereby affirmed at appellant's cost.
It is further ordered, adjudged and decreed that Lillian Joyce Frazier, Mary Jane Frazier Royce, and Norma Frazier Zualet be recognized as owners of an undivided one-twenty-fourth interest each in the following described property:
South One-Half of the Northeast Quarter (S½ of NE¼), Section 17, Township 23 North, Range 11 West, Webster Parish, Louisiana.
It is further ordered, adjudged and decreed that the following parties are the owners of the funds previously deposited in the registry of the court attributable to the one-eighth royalty interest in oil and gas production from the Williams Drilling Company, Frazier Wells Nos. 1, B-1, and 2 respectively, located upon the Northeast Quarter of Southeast Quarter of Northeast Quarter (NE¼ of SE¼ of NE¼) East twenty (20) acres of South Half of Northeast Quarter (S½ of NE¼), and Southeast Quarter of Southwest Quarter of Northeast Quarter (SE¼ of SW¼ of NE¼) all in Section 17, Township 23 North, Range 11 West, Webster Parish, Louisiana, in the proportions set opposite their names, to-wit:

Mrs. Jane Oakley Frazier 5/8
Lillian Joyce Frazier 1/24
Mary Jane Frazier Royce 1/24
Norma Frazier Zualet 1/24
Roy M. Fish 1/80
Jesse L. Boucher 22/240
Wilburn A. Slack 10/240
Melvin Boucher 16/240
J.E. Shultz 3/80

and each is entitled to delivery of such after deduction of the costs of this suit.
NOTES
[1] Hester Frazier Reynolds and Elizabeth Frazier Velasco, on January 21, 1956, and on March 6, 1956, sold certain royalty interests to Jesse L. Boucher. These interests are not contested.