457 So.2d 691 (1984)
Violet Jordan AVERETTE, et al., Plaintiffs-Appellants,
v.
Mamie Owens JORDAN, et al., Defendants-Appellees.
No. 16076-CA.
Court of Appeal of Louisiana, Second Circuit.
September 26, 1984.
Dissenting Opinion October 31, 1984.
*692 Theus, Grisham, Davis & Leigh by Paul D. Spillers, Monroe, for plaintiffs-appellants.
Blackwell, Chambliss, Hobbs & Henry by Douglas C. Caldwell, West Monroe, for defendants-appellees.
Before PRICE, MARVIN, FRED W. JONES, SEXTON and NORRIS, JJ.
NORRIS, Judge.
In this action primarily for declaratory relief, the plaintiffs[1] appeal a judgment of the trial court which refused to enforce a reversionary clause in an act transferring certain immovable property in return for the promise of the transferee to care for the transferors for the remainder of their lives and which held the transfer to be a valid onerous transfer. The defendants[2] have answered the appeal seeking review of that portion of the judgment which rejected *693 their demand to have recognized the forced portion of the deceased transferee, Wynes C. Jordan, in the succession of the deceased transferor, Amos Jordan, and to have the legal successor of the remaining transferor, Annie Jordan, who died subsequent to the rendition of judgment substituted for purposes of this appeal.[3] Finding no error in the trial court's ruling in the areas complained of in this appeal, we affirm.

CONTEXT FACTS
Amos and Annie Jordan were the parents of five children, J.C. Jordan, Wynes C. Jordan, Carl Jordan,[4] Violet Jordan Averette, and Florene Jordan McDaniel. For the greater portion of their extended lives, they resided on a 38 acre tract in rural Ouachita Parish. Both were 86 years of age in 1976 and in generally failing health. Concerned about their future welfare, Mr. and Mrs. Jordan suggested in a series of family meetings with their children that one of the children should return to the "home place" to take care of their parents and maintain their home and farm. For various reasons, each of the children, with the exception of Wynes, was unwilling or unable to agree to this request. After extended discussion, an agreement was reached between Wynes and his parents in this regard.
In accordance with this agreement, on January 6, 1977, the Jordans conveyed to their son Wynes the naked ownership of a 17 acre portion of their 38 acre tract in return for his agreement to care for them. This conveyance, made in a document entitled "Act of Onerous Donation with Right of Return", contained the following pertinent provisions:
And the said Donors did further declare it to be their purpose, desire and direction to which said Donee agrees, that the donation is burdened and the Donee hereby charged to insure and provide for the health, welfare and safety of the Donors or the survivor for the remainder of the Donors' joint lives.

Donors specifically stipulate pursuant to Article 1534 of the Civil Code of Louisiana the right of return of the property which is the subject of this Act of Donation in the event Donors, or either of them, survive Donee alone. Donors each own an undivided one-half community interest in the property which is the subject of this Act of Donation and, therefore, an undivided one-half interest in said property shall revert to each Donor who may survive Wynes C. Jordan, Donee herein. [Emphasis added.]
Notwithstanding that the act of transfer specifically provided that the donation was intended as an extra portion, which should not be subject to collation, on the same day, Mr. Jordan executed a statutory will in which he directed that Wynes be precluded from receiving any property from his estate because Wynes' legitime had been satisfied by the act of donation and bequeathed all of his property to his remaining four children in equal portions subject to the usufruct of his wife.
On March 11, 1977, some two months later, Mr. Jordan died and his succession was opened on May 10, 1977. Contained within the detailed descriptive list of succession property was the remaining 21 acre tract and expressly omitted was the 17 acre tract made the subject of the earlier act of conveyance. The joint petition was signed by all of his five children, including Wynes. The resulting Judgment of Possession recognized Mrs. Jordan as the surviving widow and owner of her undivided one-half interest in the community property and four children were recognized as owners each of an undivided one-fourth interest in the community property and four children were recognized as owners each of an undivided one-fourth interest in Mr. Jordan's *694 one-half interest in the community property. Although Wynes was omitted from the last will and testament and the judgment of possession, he nevertheless joined in the petition for probate and acquiesed in writing to a division of the property in accordance with the will.
On March 27, 1978, Wynes and his wife as well as Mrs. Jordan conveyed a 25 foot strip of the 17 acre tract to a neighbor. Mrs. Jordan appeared in this instrument to evidence her purpose to quit-claim her reversionary interest which the "appearers" acknowledged to exist.
Thereafter, on August 11, 1980, Mrs. Jordan and her four children, excluding Wynes, executed a "Cash Sale Deed" in which Mrs. Jordan purportedly sold for $10,000 cash her interest in the 21 acre tract to the four children. However, on the same date, the four children involved executed a demand note payable to Annie for $10,000 and Mrs. Jordan executed a "Dation en Paiment" in which she acknowledged her indebtedness to these four children "for an uncertain sum which sum has been advanced [by the children] for her use in her private affairs" and to release herself of that indebtedness she marked the note paid, conveying and delivering it to the children. These transactions, including a transfer of $15,000 cash to her daughter Violet, were in preparation of her entering a nursing home.
By act of partition filed of record on August 26, 1980, the four children divided the 21 acre tract into five acre parcels, each becoming the sole owner of one parcel.
Wynes died on September 6, 1980.
On January 6, 1982, J.C. Jordan sold his five acre parcel to James Hugh Averette and on January 21, 1982, Carl Jordan sold his five acre parcel to Violet. On July 26, 1982, Mrs. Jordan quit claimed her interest in the 17 acre tract to J.C., Florene and Violet.
On March 16, 1982, the succession of Wynes Jordan was opened. In those proceedings, his widow and three children listed as his separate property potential forced heirship rights to the 21 acre tract and as community property full interest in the 17 acre tract less the 25 foot strip of property earlier sold to the neighbor and were sent into possession of that property.
On August 26, 1983, this action was initiated by the plaintiffs alleging among other things that Wynes received before his death income from sales of timber and mineral leases on the 17 acre tract and sold the 25 foot strip to the neighbor without giving any of the proceeds to his mother, Mrs. Jordan, who was usufructuary of the property; that when he participated in the filing of the succession of his father, he waived any right to inheritance therein; that by recording the judgment of possession from Wynes' succession, a cloud has been placed on the titles of the plaintiffs to the 21 acre tract; and that items of furniture in the family home have disappeared into the possession of the plaintiffs. This action specifically sought an accounting to the usufructuaries for all sums which Wynes received as income from the 17 acre tract and an accounting of the furniture from the family home; a declaratory judgment determining the ownership of the 17 acre tract; a declaratory judgment determining the ownership of the 21 acre tract remaining after the act of conveyance; an order ejecting the defendants from the 17 acre tract and damages.
Defendants' answer, among other things, admitted the sale of the timber and mineral leases but contended that Mrs. Jordan had donated her portion of the proceeds to Wynes; alleged that the act of donation was an onerous donation excluded from the provisions of La.C.C. Art. 1526 thereby nullifying the provisions of the donation insofar as concerns the "Right of Return"; alleged compliance with the provisions of the donation; and that the doctrine of detrimental reliance and/or unjust enrichment entitled defendants to the ownership of the property. Defendants prayed for rejection of the plaintiffs' demands; in the alternative for damages; and in reconvention, that the three children of Wynes be placed into possession of their father's legitime in the succession of Amos Jordan and that the *695 transfers from Mrs. Jordan to the other plaintiffs be declared null.

ACTION OF THE TRIAL COURT
In written reasons for judgment, the trial court refused the plaintiffs' demand to enforce the reversionary clause finding that the act was an onerous donation of the naked ownership of the 17 acre tract reserving separate usufructs to Mr. and Mrs. Jordan and attempting to create a right of return should the donee fail to survive the donors. The trial court further found that Wynes had fulfilled his obligation to Mr. Jordan prior to his death and that upon his death any right of return had terminated. Insofar as it affected Mrs. Jordan's interest in the 17 acre parcel, the trial court found that because this was an onerous donation the right of return was inapplicable because the value of the object given did not exceed by one-half the value of the charges or services rendered by Wynes to Mrs. Jordan prior to his death. The trial court also found that the plaintiffs were entitled to no accounting and rejected the defendant's claim to the forced heirship rights of Wynes in his father's succession as well as any damages, specifically finding that the consent judgment of possession joined in by Wynes precluded their assertion of any further claims to Mr. Jordan's succession. Plaintiffs' claim for an order of eviction was denied.
Accordingly, the judgment of the trial court recognized the defendants as full owners of an undivided one-half interest in the 17 acre tract and as naked owners of the remaining one-half interest, subject to the usufruct of plaintiffs, J.C. Jordan, Florene Jordan McDaniel, and Violet Jordan Averette, and denied defendants' claim as forced heirs.

ASSIGNMENTS OF ERROR
Plaintiffs appeal, contending that the trial court committed reversible error:
(1) By not imposing upon defendants (plaintiffs in reconvention) the burden of proof in their effort to show the Donation was not a "real" donation;
(2) By finding the Donation was not a "real" donation;
(3) By not finding that Miss Annie's "right of return" was a contractual provision that caused a return of the property to her upon Wynes' death, irrespective of whether or not the Donation was a "real" donation.
The defendants have answered the appeal, reasserting their demand that they be placed into possession of the legitime of Wynes C. Jordan in the Succession of Amos Jordan.

ISSUES ON APPEAL
All parties to this appeal concede that the undivided one-half interest of Amos Jordan in the property which he transferred to Wynes is not at issue. Therefore, the pivotal issues presented in this appeal are whether plaintiffs are entitled to enforcement of the right of return contained within the transfer which would cause the one-half interest of Mrs. Annie Jordan to revert to her upon the death of Wynes, whether under any other legal theory Mrs. Jordan would be entitled to recover her undivided one-half interest, and whether the defendants have a right to enforce Wynes' forced heirship claim to a portion of the property which comprised the Succession of Amos Jordan. We will address the last issue prior to addressing the remaining two.

FORCED HEIRSHIP RIGHTS
Defendants' claims to the forced heirship rights of Wynes in his father's succession are alternative to their principal contention that they are the owners of the donated 17 acre tract. In fact, defendants seem to concede that if the true intentions of the parties are carried out, they have no claim to the remaining 21 acre tract. The trial court found that the defendants had succeeded in their principal contention that the overall intent of the parties was for Wynes to receive the 17 acre tract subject to the usufruct of his mother in lieu of any other interest in his father's succession. Therefore, it was concluded by the trial court that notwithstanding the judicial appearance *696 and concurrence of Wynes in the succession proceedings opened on behalf of his dead father's succession, he would not be entitled to enforce a legitime in addition to the property donated. However, it was further concluded by the trial court that defendants, as Wynes' heirs, were estopped by his judicial acts in the succession proceeding from claiming any rights to this tract of land.
La.C.C. Art. 2291 provides:
The judicial confession is the declaration which the party, or his special attorney in fact, makes in a judicial proceeding.
It amounts to full proof against him who has made it.
It can not be divided against him.
It can not be revoked, unless it be proved to have been made through an error in fact.
It can not be revoked on a pretense of an error in law.
In an instance in which one makes a judicial declaration and judgment is rendered in accordance therewith, he cannot ordinarily revoke the declaration and attack the judgment under the pretense of having made an error of law. This principle is equally applicable when the proceeding in which the declaration was made and the judgment rendered is a consent proceeding. Succession of Williams, 418 So.2d 1317 (La.1982).
Because Wynes joined in the succession proceedings of his father, Amos Jordan, and acquiesed in the manner in which the property was divided among the named legatees, his heirs are now precluded from asserting any interest in this succession on his behalf. See Succession of Williams, supra.

REVERSIONARY RIGHTS
In connection with this issue, the plaintiffs principally assert that a right of return was contained in the act of donation and that it should be given effect under La.C.C. Art. 1534 which allows a donor to stipulate a reversionary right in an act of donation. In the alternative, the plaintiffs contend that even if the act in question was not a true donation, then principles of contract law require that an undivided one-half interest in the property revert back to Mrs. Jordan because of the inability of the obligor under the contract to complete the performance of the charge or condition contained within the contract.
The resolution of this issue requires a multi-tiered analysis including the resolution of the classification of the act in question, the determination of the operative codal provisions and the application of the proper codal articles.
Three types of donations inter vivos are recognized by the Louisiana Civil Code: the gratuitous donation which is made without condition; the onerous donation which imposes charges upon the donee; and the remunerative donation which compensates for past services rendered. La.C.C. Art. 1523. La.C.C. Art. 1524 provides that an onerous donation is not a true donation if the value of the object given does not manifestly exceed the value of the charges. A remunerative donation is not a true donation if the value of the services to be recompensed as appreciated in money, are "little inferior" in value to that of the gift. La.C.C. Art. 1525.
The general rules stated in Articles 1524 and 1525 are specified by the "mathematical formula" of La.C.C. Art. 1526 which provides:
In consequence, the rules peculiar to donations inter vivos do not apply to onerous and remunerative donations, except when the value of the object given exceeds by one-half that of the charges or of the services.
See, Lazarus, Succession and Donations, The Work of the Louisiana Appellate Courts for the 1978-1979 Term, 40 La.L. Rev. 559 (1980). See also Oppenheim, The Donation Inter Vivos, 43 Tul.L.Rev. 731, at 751 (1969); J. Denson Smith, Conventional Obligations, The Work of the Louisiana Supreme Court for the 1958-1959 Term, 20 La.L.Rev. 224, at 225 (1960); *697 Comment, Personal Services About the Home, 23 La.L.Rev. 416, at 432 (1963). However, the correct mathematical meaning of this codal mandate has been a "constant source" of jurisprudential confusion.[5] Under the proper application of Article 1526, an onerous or remunerative donation is not a true donation unless the value of the object given exceeds the value of the charge or service by at least half the value of the charge or service. Whitman v. Whitman, 206 La. 1, 2, 18 So.2d 633 (La. 1944); Personal Services About the Home, supra at 432-433, note 78. Conversely, where the value of the charge or service exceeds two-thirds the value of the gift, the transfer is not a true donation. Whitman v. Whitman, supra; Clarke v. Brecheen, 387 So.2d 1297 (La.App. 1st Cir.1980); Personal Services About the Home, supra. The significance of this valuation is underscored by La.C.C. Art. 1526, which specifically provides that only true donations are governed by the "rules peculiar to donations inter vivos."
Additionally, when ascertaining the value of the gift for purposes of making the determination of whether the act of conveyance is a true donation under Article 1526, the gift should be valued as of the date of the donation. Steen v. Louisiana Central Lumber Co., 2 La.App. 39 (La. App. 2d Cir.1925). Moreover, it has been suggested that the charges or services *698 should also be valued as of the date of donation for purposes of making the determination under Article 1526. G. LeVan, The Louisiana Estate Planner, Vol. 8 at 250 (1982). See also Garcia v. Dulcich, 237 La. 359, 111 So.2d 309 (1959); Thielman v. Gahlman, 119 La. 350, 44 So. 123 (La.1907); J. Denson Smith, supra, at 225, Personal Services About the Home, supra, at 440 note 119. While several commentators have suggested that mortality tables be utilized to project the probable duration of the donor's life at the time of donation and thereby estimate the valueas of the time of the donationof the charge or condition to care for the donor or donors for the remainder of their lives [J. Denson Smith, supra, at 225; Personal Services About the Home, supra at 440, note 119] a prospective determination of the value of caring for a living donor until his or her death is extremely problematic given the uncertainty as to the duration of his or her life and uncertainty as to the kinds of services health will require. Thus, for pragmatic reasons, courts have used a post hoc or a posteriori evaluation in innumerable instances to determine the value of the charge or condition to care for an aged or ailing donor unto death. Almond v. Adams, 221 La. 234, 59 So.2d 132 (La.1952); Whitman v. Whitman, supra; Landry v. Landry, 40 La.Ann. 229, 3 So. 728 (La. 1888); Victorian v. Victorian, 411 So.2d 473 (La.App. 3d Cir.1982); Succession of Danos, 359 So.2d 679 (La.App. 1st Cir. 1978); Bell v. Bell, 339 So.2d 1333 (La.App. 3d Cir.1976); Fenger v. Cagnolatti, 292 So.2d 901 (La.App. 4th Cir.1974); Manuel v. Hebert, 236 So.2d 880 (La.App. 3d Cir. 1970); Robinson v. Guedry, 181 So. 882 (La.App.1938). Accordingly, an after the fact assessment of the services actually rendered and a determination of the duration, extent, and type of services actually provided may be utilized to ascertain the content and value of the donee's obligation of care.
It is noteworthy at this point to reiterate that this analysis is limited to that one-half interest in the property donated to and the charges imposed on Wynes insofar as they relate only to Mrs. Annie Jordan in this case. The trial court made a specific finding that the value of the property donated insofar as it related to Mrs. Jordan's interest in the property was the same or greater than the value of the charges imposed on Wynes and that the act was not a true donation. As will be shown, the record supports the proposition that the transfer is not a true donation not only under a post hoc analysis but also under a prospective analysis.
The plaintiffs' expert appraiser valued the 17 acre tract including its improvements at approximately $36,000. As noted by the trial court, this valuation more closely scrutinized reflects the value of the property at the time of trial in 1983 rather than at the time of the donation some six years earlier in 1977. Whereas the $36,000 appraisal incorporated a $1300 per acre evaluation, the adjoining 21 acre tract which possessed very similar characteristics was valued in 1977 at $690 per acre. This evaluation is reflected in the descriptive inventory filed in the Succession of Amos Jordan. Moreover, the valuation provided by the plaintiffs' expert established the value of full ownership of the tract, when in fact the donated property was subject to a usufruct in favor of both Mr. and Mrs. Jordan which undeniably diminished the value of the donation.[6]
Thus, given that the plaintiffs' estimate was made six years after the donation, that a significantly lower evaluation was given to adjoining similar acreage by both sides to this litigation at the time of the donation and that there was both the usufruct and right of return burdening the *699 property donated to Wynes, the trial court could have reasonably found that the donation of the naked ownership in the 17 acre tract was worth $22,000-$24,000 at the time of the donation. Therefore, its finding that the value of the one-half interest belonging to Mrs. Annie Jordan was $11,000-$12,000 at the time of the donation is not clearly wrong.[7]
Whereas the donation by Annie Jordan of her undivided one-half interest was correctly valued by the trial court, the charges imposed on Wynes insofar as they related to his mother could have reasonably been found to have been equal to or greater than the value of her interest in the property which she transferred.
In terms of a prospective analysis of the value of the charge of personal care as of the time of the donation, the following factors are operative. Wynes assumed under the act of conveyance the obligation to care for two donors, both of whom were 86 years old at the time of the donation. Under the mortality table of La.R.S. 47:2405, each of these donors had a life expectancy of some two and one-half years. Wynes' obligation of care was, of course, intended to be commensurate with the duration of both donors' lives and their health. Mr. Jordan's health was fundamentally infirm, thereby necessitating the assumption of a greater degree of concentrated care than would have been the case had he been considerably more vigorous. Mrs. Jordan's health was comparatively better at the time, and so her life expectancy was relatively indefinite. In fact, Wynes actually provided care for his mother for a period in excess of her life expectancy prior to his death.
In terms of a retrospective or post hoc analysis of the charge of support and the extent of Wynes' obligation to care for Mrs. Annie Jordan, the following factors are operative. In order to provide that care, Wynes and his wife Mamie sold their home and the one acre lot on which they had lived outside of Calhoun for 23 years, purchased a mobile home, and established their residence on the 17 acre tract adjoining the land of the Jordans some fifteen yards away. Wynes cared for his father from the date of the donation until the time of his death. Because Mr. Jordan was rapidly losing his eyesight during this time, Wynes or his wife were required to spoon feed him. Also, Mr. Jordan would become so upset and confused that his wife could not control him and Wynes would have to spend the night with him to calm and subdue him. While we recognize that the value of the services which Wynes provided on his father's behalf are not at issue in this appeal as they relate to the value which Mr. Jordan received from these services, we feel that Mrs. Jordan also received value from the services which Wynes performed on behalf of his father in that Mrs. Jordan was relieved of certain obligations in regard to his care and that she received the benefit of the additional security provided by knowing that her husband was going to be properly cared for by Wynes.
Furthermore, Wynes devoted well over three years of care and support to his mother from the date of the donation until shortly prior to his death. Both Wynes and his wife did Mrs. Jordan's shopping, built fires for her, lit her gas heaters in the early morning hours, and cleaned her house. Meals were fixed for Mrs. Jordan and brought to her. Her garbage was emptied and burned. Mrs. Jordan was provided with fresh vegetables out of a garden cultivated by Wynes and his wife and eggs were provided from their laying hens. In accordance with the wishes of his mother, Wynes expended many hours clearing her property of briars, underbrush and weeds, thereby improving considerably the appearance of her property. On one occasion when Mrs. Jordan broke her arm, Wynes and his wife provided constant live-in care for a period of two to three weeks.
*700 To the value of these specific services are also added equally significant intangibles. After the relocation of Wynes and Mamie, they were rarely absent from the property overnight. The value to an older person of the security provided by constant and responsible presence is surely inestimable. This becomes particularly significant after the death of Mr. Jordan when Mrs. Jordan was left to live alone. An additional factor which augments the value of the services provided by Wynes and his wife is the fact that they uprooted themselves from their home of 23 years and relocated in order to provide care for the Jordans. Fenger v. Cagnolatti, supra.
In light of the foregoing analysis, the trial court did not err in its determination that the value of charges was equal to or exceeded the value of the gift. Because the value of the object given did not exceed the value of the services by one-half it is not a true donation. La.C.C. Art. 1525; 1526.
Having determined that the ruling of the trial court was correct in this regard, we must now determine the effect of that ruling:
La.C.C. Art. 1534 provides:
The donor may stipulate the right of return of the objects given, either in case of his surviving the donee alone, or in case of his surviving the donee and his descendants.
That right can be stipulated for the advantage of the donor alone.
Accordingly, in a true donation, a donor may stipulate a right of return under this article. However, La.C.C. Art. 1526 is applicable to this situation and provides:
In consequence, the rules peculiar to donations inter vivos do not apply to onerous and remunerative donations, except when the value of the object given exceeds by one-half that of the charges or of the services.
Because we have found that the donation in this case was not a true donation, the right of return specifically provided for by Article 1534 cannot apply.
This act of donation contains the following specific language: "[D]onors specifically stipulate pursuant to Article 1534 of the Civil Code of Louisiana the right of return of the property * * * in the event Donors, or either of them, survive Donee alone."
In construing the language of this agreement, we are constrained to give effect to obligations, which are clearly enunciated, according to the terms expressed. La.C.C. Art. 1963 provides in this context that "When the intent of the parties is evident and lawful, neither equity nor usage can be resorted to, in order to enlarge or restrain that intent ..." An identical principle is expressed in La.C.C. Art. 1945: "[C]ourts are bound to give legal effect to all such contracts according to the true intent of all the parties." La.C.C. Art. 1945 further provides that "the intent is to be determined by the words of the contract, when these are clear and explicit and lead to no absurd consequences." We are thus codally constrained to give effect to the parties' clearly expressed intention.
The act in question admits of little doubt that the parties intended only to exercise the right provided for by La.C.C. Art. 1534 and to stipulate the right of return pursuant to its provisions. La.C.C. Art. 1764(A) provides that "All things that are not forbidden by law, may legally become the subject of, or the motive for contracts." In a similar vein, La.C.C. Art. 1967 states that "When contracting parties have not derogated from [the] law, [their contractual] provisions are to be followed." In the instant case, we are compelled to conclude that the right of reversion referred to within the act of transfer is forbidden by law because it is an express rule of donation which is inapplicable to those donations which are not true donations as a matter of law. Accordingly, this provision of the transfer can be given no effect, and the document must be viewed as if this provision does not exist because there has been no showing made in this case that the value of the thing exceeds by one-half the value of the services thereby rendering this rule peculiar to donations inter vivos inapplicable. *701 See Sauce v. Williams, 434 So.2d 613 (La.App. 3d Cir.1983).
Thus, the applicable rules are those contained within the codal articles on conventional obligations.
La.C.C. Art. 1997 provides:
An obligation is strictly personal, when none but the obligee can enforce the performance or when it can be enforced only against the obligor.

* * * * * *
La.C.C. Art. 2000 provides:
The obligation shall be presumed to be personal on the part of the obligor, whenever, in a contract to do, he undertakes to perform any thing that requires his personal skill or attention; in this case, if that, which was to be done, was not solely and exclusively for the use or gratification of the obligee, the obligation, although personal as to the obligor, will be heritable against the heirs of the obligee for the equivalent to be paid or given for that which was to be done.
La.C.C. Art. 2001 provides:
The obligation shall be presumed to be personal as to the obligee, in a contract to do or to give, when that which was to be done or given, was exclusively for the personal gratification of the obligee, and could produce no benefits to his heirs.
It is clear that under Article 2001 the obligation to care for a donor until his death is an obligation which is personal and not heritable as to both the obligee and the obligor. Victorian v. Victorian, supra. Accordingly, the question becomes what was the effect of the death of the obligor Wynes before he completed the performance of his obligation.
In Victorian v. Victorian, supra, the court was faced with the resolution of the effect of the death of an obligor before he completed the performance of his obligation to care for another. In that connection, the court stated:
The present case is complicated by the fact that Clargia, the obligor, did not die until after partial performance by him. Clargia, the obligor, took care of Curley, the obligee, for approximately six years before Clargia died. The above quoted Articles of the Civil Code [Articles 2002-2003] do not expressly answer the question of the rights and obligations of the heirs of the obligor who dies after partial performance of an obligation personal as to the obligor. However, Alain A. Levasseur, Precis in Conventional Obligations, A Civil Code Analysis, at page 79, gives the following helpful discussion in stating general principles applicable in case of fortuitous nonperformance:
(a) Principle: "Res perit debitori".
In the situation where one obligation can no longer be performed because of fortuitous event, the other obligation will also become extinct. The release of one party leads to the release of the other. This solution can be explained by the theory of cause. The risks are, therefore, in a sense, for the party whose performance has become impossible because of fortuitous event.

Example: the patron of a theater is entitled to the reimbursement of his ticket if the theater cannot put on the show as a result of the death of an actor.
This principle (not expressly stated in the code) can be induced from a series of code articles: example; LCC 2697; 2759; 2760; 2879.
This principle is applicable to all synallagmatic contracts whether they create obligations to do or not to do or obligations to give a thing in kind not yet singled out by the time the fortuitous event occurs. In addition, the obligation must be one of result [if the obligation is one of means, either the obligor has been diligent and there has been performance or he has made a mistake and he will be held liable].
Where there is impossibility of performance by the obligor, the contract is extinguished of right without intervention of the court. Should the court be called upon, it can only recognize the failure of performance of one obligation and the correlative extinction of the other *702 obligation: example; LCC 2697, first sentence.
Where the fortuitous event has caused a partial impossibility of performance, the court will decide whether the dissolution of the contract should be total or partial only; where the dissolution is partial only, the creditor will have to perform part of his own obligation: example; LCC 2697, second sentence. As a result, the obligations of the parties are restructured, re-balanced.
Particularly applicable to the present case is the last paragraph of the above quotation. The fortuitous event, Clargia's death, caused only a partial impossibility of performance. In this situation, the suggested rule is that the court should decide whether the dissolution of the contract should be total or only partial. Under the circumstances of the present case, we think the dissolution of the contract should be partial only, since the obligor had taken care of the obligee for approximately six years before the obligor died. As a result, an effort should be made by the court to restructure or re-balance the obligations of the parties, so as to place them as nearly as possible in equal positions. In Richardson v. Cole, supra, [173 So.2d 336 (La. App. 2d Cir.1965)], and in Acosta v. Cole, supra, [178 So.2d 456 (La.App. 1st Cir.1965) ], this same rationale was applied by allowing the defendant to keep the fees for the dancing lessons already furnished but requiring the defendant to return to plaintiff the fees for the lessons which plaintiff was unable to take after she became disabled.
In the present case, the solution requires that some value be given to the services performed by Clargia in taking care of Curley from the time of the conveyance of the 26 acres until the time of Clargia's death, a period of about six years. There is no evidence in the record to show the exact value of these services. However, Clargia's services in caring for his brother for these six years clearly had substantial value. In the present case, we need not be too precise in determining the exact value, because the value of these services, which constituted an onerous obligation of the donation, can be added to the value of the services rendered by Clargia and his wife before the 1975 conveyance, which services were those for which the donation was remunerative. The total value of the services rendered before and after the 1975 donation is clearly as much or more than the $28,000 value of the 26 acres. Thus, the 1975 donation is valid.
We conclude that the analysis as set forth in Victorian is equally applicable to the instant situation. As stated before, the trial court's factual finding was that the value of the services rendered to Mrs. Annie Jordan by Wynes prior to his death was equal to or greater than the value of the object given, i.e., her undivided one-half interest in the naked ownership of the property, and this finding is not clearly wrong. Applying that finding to whether the onerous transfer should be dissolved partially or totally, as is sought by the plaintiffs, we conclude that the onerous transfer must be upheld. We arrive at this conclusion because the consideration given by Wynes through his performance of services on behalf of his mother prior to his death was equal to or greater than the value of the property given. Therefore, the onerous transfer cannot be held to be subject to any type of reversionary right or resolutory condition. Simply stated, Wynes' activities were sufficient consideration to compensate Mrs. Jordan to balance the obligations between the two of them. The only way to place Wynes and Mrs. Jordan "as nearly as possible in equal portions" in this case is to allow Wynes' heirs to retain the property. Accordingly, the trial court did not err in refusing to allow Mrs. Annie Jordan's interest in the property to revert back to plaintiffs.
For the foregoing reasons, the judgment of the trial court is affirmed in its entirety. Costs of this appeal are cast against appellants.
JUDGMENT AFFIRMED.
SEXTON, J., dissents and assigns written reasons.
*703 SEXTON, Judge, dissenting.
The trial court and the majority declined to give effect to the right of return under this rationale: Art. 1534, which entitled a donor to stipulate a right of return, is a rule peculiar to donations inter vivos; under Art. 1526, the rules peculiar to donations inter vivos apply only to true donations; the donation at issue was not a true donation; therefore the donor could not stipulate a right of return. I disagree. While the rules peculiar to donations inter vivos may not govern this onerous transfer, there is nothing which prohibits the application to this act of different codal articles which have the same or similar content as the codal articles on donations inter vivos. Thus, while Art. 1534 does not apply to this act, Arts. 2013, 2045-2047, which permit the revocation or dissolution on an obligation to give upon the occurrence of a resolutory condition, should apply to it. In short, donations inter vivos rules do not apply to this transfer; however, this fact does not mean that other codal articles of similar content should not apply to it.
The Civil Code makes it clear that a civil contract may assume any form, effect or content intended by the parties, unless expressly prohibited by law. In the absence of contrary provision, contracting parties may ascribe any substance they wish to the object of a contract; unless prohibited by law or public mores, they may assume any type of obligation they wish. The freedom and autonomy of contracting parties in a civilian jurisdiction is aptly described by LSA-C.C. Art. 1764(A), which provides that "All things that are not forbidden by law, may legally become the subject of, or the motive for contracts." Civil Code Art. 1967 states, in a similar vein, that "When the contracting parties have not derogated from [the] law, [their contractual] provisions are to be followed."
I have found no legal or moral prohibitions proscribing the content or effect of the obligations herein assumed by the contracting parties under the codal principles enunciated above. As the Supreme Court has declared,
"[I]n the absence of some special prohibition founded in considerations of public policy, a sane man is allowed to do as he pleases with his own ...." Thielman v. Gahlman, 119 La. 350, 44 So. 123 (1907) at 125.
The code clearly mandates, moreover, that the courts give effect to obligations, which are clearly enunciated, according to the terms expressed. Art. 1963 provides in this context that "When the intent of the parties is evident and lawful, neither equity nor usage can be resorted to, in order to enlarge or restrain that intent ...." An identical principle is expressed in LSA-C.C. Art. 1945(2): "[C]ourts are bound to give legal effect to all such contracts according to the true intent of all the parties." LSA-C.C. Art. 1945(3) further provides that "the intent is to be determined by the words of the contract, when these are clear and explicit and lead to no absurd consequences." We are thus codally constrained to give effect to the parties' clearly expressed intention, and the act in question admits of little doubt that the parties intended that a half interest in the undivided ownership of the 17-acre tract would revert to each donor that survived Wynes.
The right of return or reversionary clause herein expressed constitutes a resolutory condition: the occurrence of an uncertain eventWynes' death before the demise of either of the donorsrevokes or dissolves the donors' obligation to convey property. LSA-C.C. Art. 2045. Insofar as the code recognizes the validity of a resolutory condition, it necessarily recognizes the validity of this reversionary right which is merely a specialized type of resolutory condition. It is significant in this context that there is codal authority and judicial precedent for revoking or dissolving a conveyance of real property for a donee's failure to satisfy the condition, charge or obligation imposed on him. LSA-C.C. Arts. 2046, 2045, 2047, 2130; Garcia v. Dulcich, 237 La. 359, 111 So.2d 309 (1959); Moore v. Sucher, 234 La. 1068, 102 So.2d 459 (1958); *704 Board of Trustees of Columbia Road Methodist Episcopal Church of Bogalusa v. Richardson, 216 La. 633, 44 So.2d 321 (1949); Voinche v. Town of Marksville, 124 La. 712, 50 So. 662 (1909); Shapiro v. Kimbrough, 20 So.2d 24 (La.App. 1st Cir. 1944); Vanzant v. Morgan, 181 So. 660 (La.App. 2d Cir.1938).
Most importantly, Civil Code Article 2013 specifically establishes that an obligation to convey real property may be contractually encumbered by a resolutory condition. Article 2013 provides:
Conditions imposed on real obligations
The real obligation, created by condition annexed to the alienation of real property, is susceptible of all the modifications that the will of the parties can suggest, except such as are forbidden by law. These conditions are either conditions precedent, which suspend the operation of the contract until they are performed, or subsequent and resolutory, which, unless they are performed, annul the contract. These will be more fully defined in the section which treats of conditional obligations.
Moreover, I am not certain that Victorian v. Victorian, 411 So.2d 473 (La.App. 3rd Cir.1982) is of any real assistance in resolving the issues in this cause. The onerous transfer at issue therein did not, as here, contain an express right of return. Also, Victorian centered on the question of the personal nature of the obligation at issue there. The personal or heritable nature of Amos's and Annie's obligation to convey property is not an issue herein because this obligation is by its terms personal as to Wynes and terminates upon his death. See LSA-C.C. Art. 1999.
Thus, I would disagree with the majority that the right of return cannot be given effect in this cause because one can only have a right of return in a purely gratuitous donation, and in no other contract. I would then treat what I consider to be the most significant issue in the case, i.e., defendant-appellees' argument that if the right of return is enforced with respect to an undivided one-half interest in the 17-acre tract, that they're entitled to a monetary award for services rendered in Annie's behalf.
The basis for this argument is LSA-C.C. Art. 2045 which states that the occurrence of a resolutory condition "operates the revocation of the obligation [dissolved by the resolutory condition], placing matters in the same state as though the [dissolved] obligation had not existed."
The jurisprudence has adhered to the codal principle that the occurrence of a resolutory condition necessitates the nullification of the reciprocal obligation as well as the dissolved obligation, and requires the restitution to both parties of what they have given or done under the contract. Where an obligation is dissolved by a resolutory condition, the courts generally nullify the effects of the reciprocal obligation as well; where the obligor of the dissolved obligation is relieved of his contractual duty by the occurrence of a resolutory condition, the obligor of the reciprocal obligation is similarly absolved or at least compensated for what he has given or done. In re Mechanics' Society, 31 La.Ann. 627, 634 (La.1879); Lee v. Taylor, 21 La.Ann 514 (La.1869); Concrete Pipe Products Co., Inc. v. Bell, 427 So.2d 551 (La.App. 3d Cir.1983), writs denied, 433 So.2d 1052 (La. 1983); Poissenot v. Guildcraft Homes, Inc., 394 So.2d 660 (La.App. 1st Cir.1980); French v. Zbornitzy, 11 La.App. 197, 123 So. 177 (1929).
However, in my view, while the principle asserted by the appellees comports with the forementioned codal and jurisprudential doctrine, I believe that it is not applicable to the instant case, and Wynes' heirs are therefore not legally entitled to be monetarily compensated for his services in caring for Annie. My conclusion in this respect is based on the fundamentally aleatory nature of the contract at issue.
The code provides that a contract is aleatoryas opposed to certain"when the performance of that which is one of its objects depends on an uncertain event." LSA-C.C. Art. 1776. Thus the effects of *705 an aleatory contract, "with respect both to the advantages and losses, whether to all the parties or to one or more of them, depend on an uncertain event." LSA-C.C. Art. 2982.
An aleatory obligation is conditional because it depends on an uncertain event, and therefore precisely conforms to the definition of a conditional obligation articulated by Article 2021. Aleatory contracts are a type of conditional obligation and are a subset of the larger category of conditional obligations.
The essence of an aleatory contract is the risk assumed by one or both parties to the contract. Moore v. Johnston, 8 La.Ann. 488 (La.1852); McDonald v. Grande Corp., 214 So.2d 795 (La.App. 3d Cir.1968); 1 S. Litvinoff, Obligations in 6 Civil Law Treatise, §§ 108, 109 (1969); Comment, The Non-Actionable Aleatory Contract: Gaming and Betting in Louisiana, 22 Tul.L. Rev. 311 (1947). All risks appertaining to an aleatory contract and not excepted by the parties are assumed by them. Moore v. Johnston, supra; Obligations, Civil Law Treatise, supra. One or both parties venture capital or property, or executes performance, under the clear understanding that they might not be compensated for said disbursements or acts, and may therefore incur a loss. Losecco v. Gregory, 108 La. 648, 32 So. 985, 992 (1902). An aleatory contract thus embodies a gamble or risk by one or both parties.
The object of an aleatory contract is a chance for gain. Losecco v. Gregory, supra; The Non-Actionable Aleatory Contract: Gaming and Betting in Louisiana, supra. It is a hope, rather than a thing, that is the object of an aleatory contract, and therefore a hope rather than a thing that is ultimately conveyed. Losecco v. Gregory, supra. This precept is poetically illustrated by the language of Article 2451 which addresses aleatory sales:
It also happens sometimes that an uncertain hope is sold; as the fisher sells a haul of his net before he throws it; and, although he should catch nothing, the sale still exists, because it was the hope that was sold, together with the right to have what might be caught.
Thus it is my view that the onerous transfer at issue is an aleatory contract. It partakes of the classic characteristics of aleatory contracts. In the first instance, the performance of the obligation depends upon an uncertain event. The obligation in this instance was the duty to convey 17 acres, and this obligation was expressly made contingent upon an uncertain event Wynes' survival of the donors, his parents. Moreover, one of the parties to this contract assumed a risk under the explicit terms of the contract. Wynes expressly assumed the risk that if he died before either or both of the donors, his estate would lose half or full interest of the property conveyed to him. The conclusion that the onerous transfer is an aleatory contract comports with the Supreme Court's pronouncement in Thielman v. Gahlman, supra. The Supreme Court stated therein that a contract whereby one party conveys real property in exchange for an obligation to care for the grantor until death is aleatory in nature.
Thus, I believe the difficult task in this cause is the determination of the applicability to this contract of the general rule of Article 2045 that the occurrence of a resolutory condition necessitates compensation of the creditor. I moreover contend, for the following reasons, that the Article 2045 rule mandating compensation of the creditor of the obligation dissolved by resolutory condition is not in all instances applicable to aleatory contracts.
In the first instance, that Article 2045 and the jurisprudence interpretive thereof, mandates the compensation of the creditor of an obligation dissolved by resolutory condition, where that creditor has rendered partial performance under the contract of which the dissolved obligation was part. However, it is fundamental to the nature of aleatory contracts that one of the parties thereto may incur an uncompensated loss. Although these codal rules are divergant, they both apply to contracts in which the rights and obligations of the parties are *706 dependant upon an uncertain event or condition. Thus, the application of these codal provisions are in apparent conflict in this cause.
It is my view, however, that these provisions can be reconciled when contextually construed and read in pari materia in accordance with traditional civilian modes of statutory construction. LSA-C.C. Art. 17. When these apparently conflicting statutory provisions are contextually interpreted, they yield the following unitary principle: although as a general rule the creditor of an obligation dissolved by resolutory condition is entitled to be compensated for partial performance rendered under the terms of the contract, the creditor of an obligation dissolved by resolutory condition need not be compensated under an aleatory contract where under the terms of the contract he has assumed the risk that he will absorb the loss inherent in the occurrence of the resolutory condition. I believe that the Article 2045 rule mandating compensation of consideration paid and services performed is not invariably applicable to all aleatory contracts. In short, the code clearly envisions that a party to an aleatory contract may incur an uncompensated loss notwithstanding the restorative principle of Article 2045.
This statutory construction is also supported by the interpretive principle that the courts should avoid constructions which render statutory provisions superfluous. Hills v. Bonin, 329 So.2d 773 (La.App. 1st Cir.1976), app. denied, 333 So.2d 237 (La. 1976); Peyrefitte v. Harvey, 312 So.2d 159 (La.App. 1st Cir.1975), writ refused, 314 So.2d 736 (La.1975); Hoffpauir v. City of Crowley, 241 So.2d 67 (La.App. 3d Cir. 1970), writ denied, 242 So.2d 578 (La.1971); Legros v. Conner, 212 So.2d 177 (La.App. 3d Cir.1968); Higgins, Inc. v. Walker, 129 So.2d 840 (La.App. 1st Cir.1961). To adopt the view that Article 2045 invariably mandates that the creditor of the dissolved obligation be restored to his situ quo ante in all contracts, is to effectively nullify the clear codal mandatecontained in Articles 1776 and 2982that a party to an aleatory contract may indeed suffer an uncompensated loss.
The conclusion I recommend herein is further supported by the civilian principle of statutory construction that where a general provision conflicts with a more specific provision, the more specific provision should be given effecteven if this involves restricting the application of the general principle. Smith v. Cajun Insulation, Inc., 392 So.2d 398 (La.1980); State ex rel. Bickman v. Dees, 367 So.2d 283 (La.1978); Esteve v. Allstate Ins. Co., 351 So.2d 117 (La.1977); State v. Maduell, 326 So.2d 820 (La.1976). Article 2045 restitution mandate is a general provision which applies in broad terms to all obligations subject to a resolutory condition. However, the codal recognition in Articles 1776 and 2982 that a contractual party may incur an uncompensated loss is a more specific provision which applies only to aleatory obligations, which constitute a subset of the larger class of obligations subject to resolutory conditions. Thus the more specific principle contained in Articles 1776 and 2982 that a contractual party may incur an uncompensated loss modifies the more general Article 2045 provision mandating that contractual losses be restored.
The wisdom and equity of the codal rule that a party to an aleatory contract may incur an uncompensated loss is classically manifest in the facts of this case. Upon the death of Amos some 12 weeks after the execution of the onerous transfer, Wynes became the perfect owner of an unencumbered half-interest in 17 acres; in short, he received the equivalent of 8-½ acres for intermittent services rendered over three months. However, because Wynes predeceased Annie, Wynes' estate received nothing for his efforts in caring for Annie over the course of three years subsequent to Amos's death. If we were to grant Wynes' estate compensation for his efforts on behalf of Annie and leave undisturbed the ownership Wynes obtained upon Amos's death, we would foster this inequitable result: plaintiffs would be bound to the unfavorable terms of the first half of the contract; and the defendants would be relieved *707 of the unfavorable terms of the second half of the contract. Such a disposition would bind plaintiffs to the terms of the contracts that were disadvantageous to them, and relieve defendants of the terms of the contract that were disadvantageous to them (the defendants). The intrinsic unfairness of such an approach demonstrates the soundness of the aleatory theory.
Under the aleatory approach, both parties are held to the terms of a contract, the risks and benefits of which it must be presumed were fully considered by the parties before they consented to be contractually bound. The crux of the matter is that the equality of consideration in an aleatory contract inheres in the equality of chance. To alter that balance by rewriting the contract is to disregard the consideration that, if the obligation owed to a party is risky and problematic, it must on that account be presumed that he paid less consideration for said obligation. To reform this aleatory contract would be to hold one party to the terms of the bargain, while relieving the other; to substitute the judgment of the court for the intent of the parties; and to look with disfavor on a person that the probabilities have favored with good fortune.
NOTES
[1] The plaintiffs in this action are Violet Jordan Averette and her husband, Herman Averette; James Hugh Averette; Florene Jordan McDaniel and her husband, J.M. McDaniel; J.C. Jordan; and Annie Jordan.
[2] The defendants in this action are Mamie Owens Jordan, widow of Wynes Jordan and her children; James Richard Jordan; Betty Jordan Barnes and Kathleen Jordan Griffin.
[3] Subsequent to the rendition of this judgment, Annie Jordan died and her legal successor, Carl Jordan, has been substituted for purposes of this appeal.
[4] Carl Jordan was not made a party to this proceeding until he was substituted as the legal successor of Mrs. Annie Jordan.
[5] As one commentator has noted,

The correct mathematical meaning of Article 1526 has been a constant source of confusion in the jurisprudence. The article clearly states that the rules peculiar to donations apply only when the value of the thing given exceeds by one-half the value of the charge or service, i.e., the former is at least one and one-half times greater than the latter. Another, and perhaps clearer, statement of this rule is that the rules peculiar to donations do not apply if the value of the charges imposed or the services rendered exceeds two-thirds of the value of the thing given. The opinion in Whitman v. Whitman, 206 La. 1, 18 So.2d 633 (1944) several times states the rule in this manner. E.g., "the services rendered by the donee in this instance ... greatly exceeded two-thirds of the value of the property donated; which is the same as to say that the value of the property donated did not amount to one and one-half times the value of the services rendered by the donee." Id. at 22, 18 So.2d at 640. The Whitman case is probably the clearest jurisprudential example of the correct application of Article 1526. Other cases correctly stating the rule of the article include In re Andrus, 221 La. 996, 60 So.2d 899 (1952); Rowlus [Bowlus] v. Whatley, 129 La. 509, 56 So. 423 (1911); (not a case of personal service rendered about the home); Pulford v. Dimmick, 107 La. 403, 31 So. 879 (1902) (same); Placid Oil Co. v. Frazier, 126 So.2d 800 (La. App. 2d Cir.1961); Hearon v. Davis, 8 So.2d 787 (La.App. 2d Cir.1942); Robinson v. Guedry, 181 So. 882 (La.App.Orl.Cir.1938); Steen v. Louisiana Central Lumber Co., 2 La.App. 39 (2d Cir.1925). Frequent misstatements of the rule are that the value of the services rendered or charges imposed must exceed one-half the value of the object given for the rules peculiar to donations to be inapplicable; and that the rules peculiar to donations will be applied if the value of the thing given is double that of the services or charges. E.g., Castleman v. Smith, 148 La. 233, 86 So. 778 (1920); Latour v. Guillory, 130 La. 570, 58 So. 341 (1912); Succession of Dopler v. Feigle [Feigel], 40 La.Ann. 848, 6 So. 106 (1888); Lagrange v. Barre, 11 Rob. 302 (La.1845); Bordelon v. Brown, 84 So.2d 867 (La.App. 2d Cir.1956); Lemoine v. Lemoine, 27 So.2d 650 (La.App. 2d Cir.1946); Lafield v. Balzrette, 21 So.2d 156 (La.App. 2d Cir.1945). That in all these cases the court, immediately prior or subsequent to its incorrect statement of the rule, either quoted or paraphrased Article 1526 indicates failure to realize there was any difference between the rule as misstated by the court and as laid down by Article 1526. The difference is easily illustrated. Assume that the value of the thing given is $9,000. If the article is correctly interpreted, the value of the services apprecited in money (pretermitting fractions of dollars) would have to be at least $6,001 in order that the rules peculiar to donations would not apply; whereas, under the usual incorrect interpretation the services would only have to be valued at $4,501. Although the case was decided correctly on other grounds, Moore v. Sucher, 234 La. 1068, 102 So.2d 459 (1958), illustrates a situation where this different result would follow. The Moore case is discussed in The Work of the Louisiana Supreme Court for the 1957-1958 TermSales, 19 La.L.Rev. 319, 322 (1959).
One case even stated the rule to be that the rules peculiar to donations are applicable only if the value of the thing given exceeds one-half of the value of the services. Succession of Spann, 169 La. 412, 417, 125 So. 289, 291 (1929). Fortunately, this seems to be the only instance of such an interpretation of Article 1526.
Comment, Personal Services About the Home, 23 La.L.Rev. 416, at 432-433, note 78.
[6] Under the computations provided by the statutory tables of LSA-R.S. 47:2405, and given that donor/usufructuaries, Amos and Annie, were both 86 at the time of the donation, the usufruct reduced the value of the donation by some 13 percent. Moreover, the value of the donation to Wynes and his heirs was reduced by an inestimable amount by the right of return which burdened each half interest in the donated 17 acre tract.
[7] The trial court actually concluded that the value of the services rendered equaled the value of the object given, even had the value of the object given been considered to be the value estimated by plaintiff's appraisers, i.e., $17,000.